[No. G041948. Fourth Dist., Div. Three. Aug. 11, 2011.]

In re Marriage of ELAINE PRENTIS-MARGULIS, and ALAN D. MARGULIS.
ELAINE PRENTIS-MARGULIS, Appellant, v.
ALAN D. MARGULIS, Appellant.

1254

## Counsel

Law Offices of Steven E. Briggs and Luis A. McKissick for Appellant Elaine Prentis-Margulis.

Law Offices of Burch, Coulston & Buncher and Todd P. Coulston for Appellant Alan D. Margulis.

Stephen Temko and Dawn Gray for the Association of Certified Family Law Specialists and the Southern California Chapter of the American Academy of Matrimonial Lawyers as Amici Curiae, upon the request of the Court of Appeal.

## Opinion

**ARONSON, J.**—In a marital dissolution proceeding to divide the community property, where the nonmanaging spouse offers prima facie evidence that community assets of a certain value have disappeared while in the control of the managing spouse postseparation,[1] should the managing spouse have the burden of proof to account for the missing assets? The answer is yes.

Husband and wife separated after a 33-year marriage and, for 12 postseparation years, continued to handle their joint finances as before: Husband had complete control of substantial community investment accounts and paid all the bills; wife trusted him to manage their finances for their mutual benefit. Just before trial, however, husband disclosed for the first time that the once-brimming investment accounts were virtually empty. Without any corroborating evidence, he attributed the dissipation of account values to proper expenditures and stock market losses.

At trial, wife argued the court should charge husband with the missing funds unless he proved he did not misappropriate the money. Her only evidence of missing funds was a financial statement husband prepared three years after separation and nine years before trial. The trial court concluded the document was insufficient evidence the accounts had contained the stated amounts postseparation, and declined to charge husband with the missing funds. The ensuing property division required wife to make a large equalizing payment to husband.

Based on relevant Family Code provisions, equitable principles, and case law, we conclude the trial court erred in failing to shift to the managing

---

[1] As used here, "postseparation" means after the spouses have begun "living separate and apart," as that expression is used in Family Code section 771, subdivision (a).

spouse the burden of proof concerning the missing community assets. Once a nonmanaging spouse makes a prima facie showing of the existence and value of community assets in the other spouse's control postseparation, the burden of proof shifts to the managing spouse to prove the proper disposition or lesser value of those assets. Failing such proof, the court should charge the managing spouse with the assets according to the prima facie showing.

I

FACTUAL AND PROCEDURAL BACKGROUND

Alan D. Margulis and Elaine Prentis-Margulis separated after more than 33 years of marriage. On August 12, 1996, Alan[2] moved out of the family residence in Irvine and relocated to Chicago to start a new job. Elaine remained in the family home (the Sycamore house), while the couple's two adult children lived elsewhere.

*Marital Finances from Separation Through Filing of Dissolution Petition*

During the marriage, Alan had been the sole breadwinner and exercised complete control of the couple's finances. He managed several community checking accounts from which he paid the bills. He also managed their investment portfolio, which included brokerage accounts at various institutions, including Sutro & Company, John Hancock Clearing Corporation, and Charles Schwab, the custodian of two community individual retirement accounts (IRA's) held in Alan's name.

As explained more fully below, the record contains limited documentary evidence of the *value* of the community investment accounts Alan was managing at separation, or afterward.[3] The joint income tax returns Alan submitted into evidence provide some inkling of value. The Margulises' 1996 schedule D, the statement of their capital gains and losses, reported that between January and July of 1996, they sold $1,142,111 worth of short- and long-term stock holdings, and two other long-term investments that generated another $68,091.

The size of the community estate grew larger postseparation due to several substantial infusions of community cash. This increase consisted of

---

[2] For clarity and convenience, "we refer to the parties by their first names . . . . We do not intend this informality to reflect a lack of respect. [Citation.]" (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2 [47 Cal.Rptr.3d 183].)

[3] Despite repeated requests from a court-appointed forensic accountant, Alan never produced any account statements for the Sutro & Company or John Hancock investment accounts. As for the two community Charles Schwab IRA accounts, Alan produced only two statements for each account, reflecting the balance of each as of December 31, 1996, and January 31, 1999. According to those statements, on December 31, 1996, four months after separation, account No. 0916 had a balance of $170,062 and account No. 1106 had a balance of $32,701.

$104,839.75 in severance pay related to Alan's preseparation employment, $179,708 from the sale of the couple's Palm Desert house, and $84,858 from cashing out a life insurance policy.[4] Collectively, these additional sums amounted to $369,405.

After Alan moved to Chicago, he continued to manage the community investments and to pay Elaine's bills, including all the expenses for the Sycamore house, and other community obligations. On a number of occasions, Alan also wrote a check directly to Elaine, typically for $1,000 to $1,500.

Initially, Alan paid the bills with checks drafted from the couple's Merrill Lynch money market checking account. In September 1998, Alan began paying his, the community's, and Elaine's bills from a new separate property account, identified as his "Chevy Chase" bank account. In testimony, Alan acknowledged that he freely transferred community property funds into his Chevy Chase account and other separate bank accounts.

Both parties appeared content with the postseparation status quo since neither filed for divorce, and Elaine did not seek a temporary support order. During the separation, as before, Elaine left management of their joint finances entirely to Alan. She received no account statements from the various banks or brokerage firms holding the community assets.

*The Petition for Dissolution and Alan's Property Disclosures*

In 2001, Elaine began paying the mortgage on the Sycamore house and also began earning income as an actress. On June 7, 2002, nearly six years after separation, Elaine filed a marital dissolution petition. Alan waited until February 21, 2007, to file his response. Neither document disclosed the extent of the marital property. Elaine's declaration regarding community assets listed only the Sycamore house and miscellaneous art and jewelry, but stated she would amend the petition to add community assets as they became known. Alan claimed in his declaration that "[t]he nature and extent of community . . . property has not yet been ascertained" and that he would amend the petition as the property "is discovered."

The mandatory settlement conference briefs, exchanged in October 2007, more than 11 years after separation, gave the first inkling of the dispute brewing. The two briefs painted dramatically different views of the community property subject to division.

---

[4] At trial, Alan stipulated to the community property character of the proceeds received from the desert house and life insurance policy; the trial court found the severance pay was a community asset and Alan does not challenge that finding on appeal.

Elaine's brief identified the following community assets within Alan's possession and control, and thus chargeable to him in the division: $180,000 proceeds from the sale of the Palm Desert house; $100,000 proceeds from a Bank of America line of credit; $271,000 severance package from his preseparation employer; $350,000 proceeds "from the IRA and securities sale"; and $75,000 when Alan cashed out a life insurance policy. Elaine estimated the total community property chargeable to Alan as approximately $901,000. Elaine asserted the court could achieve an equal property division if it allowed her to retain the Sycamore house, with $450,270 in equity, and $20,000 cash received from refinancing the property in 1994, and she paid an outstanding tax obligation of $45,000, with Alan providing her a $237,865 equalizing payment.

Alan's settlement conference brief identified the Sycamore house as "the main remaining community asset" and proposed that it be sold and the proceeds divided equally between the parties. He asserted the court could achieve an equal property division by halving any community retirement or pension benefits and allowing each party to keep the car, bank accounts, and "other financial accounts in [his or her] name since the date of separation."

Alan's brief failed to mention any of the community property investment accounts that had existed at the date of separation, such as the Sutro & Company account or the John Hancock and Charles Schwab accounts. Nor did his brief mention the Merrill Lynch bank account or the $369,405 in community funds Alan received postseparation from the severance package, desert house sale, and life insurance policy.

On April 4, 2008, the parties obtained a status-only judgment of dissolution and a trial date to resolve the reserved property division issues.

The parties' trial briefs simply expanded on their settlement briefs. Elaine's trial brief asserted higher values for the investment accounts chargeable to Alan, based on a key document she would later offer into evidence as "exhibit 18." She contended Alan had received "from Charles Schwab [IRA] accounts . . . $230,000" and "from Sutro EQ Account . . . $450,000 . . . ."

Alan's trial brief asserted the only "presently existing community" property consisted of the Sycamore house, the personal property within it, and an IRS tax loss carryforward of $312,122. As for the various financial accounts Alan maintained postseparation, he asserted these had been depleted over the ensuing 12 years by paying community expenses, Elaine's "daily maintenance and expenses," and by stock market losses. He claimed he would introduce evidence of both the expenditures and market losses that depleted the accounts.

*Evidence and Findings on the Community Assets Chargeable to Alan*

Though the parties clashed at trial on a number of issues relating to the value of the community assets chargeable to Alan,[5] the most significant dispute concerned whether to charge Alan with the value of the stock brokerage and money market accounts in Alan's postseparation control, namely, the Sutro & Company, John Hancock, Charles Schwab, and Merrill Lynch accounts.

Except as to the Charles Schwab IRA's, Alan presented no evidence on the value of these community accounts at any time postseparation. Instead, Alan generally testified that these community accounts were now virtually empty (except for $20,000 at Charles Schwab) due to stock market losses and expenditures for the community's or Elaine's benefit. Alan argued that the only community assets chargeable to him were the $20,000 remaining in the Charles Schwab IRA's.

Alan produced no evidence at trial to show how he disposed of the funds under his control. Nor did he produce evidence tracing funds from community accounts to community expenditures or purchases. The only specific evidence he offered concerning the disposition of any community funds was his testimony about withdrawing funds from the Charles Schwab IRA's in 1999, 2000, and 2001, in amounts collectively totaling $164,390, as reported on the couple's joint tax returns. Alan testified that he withdrew these IRA funds because he needed money to pay current expenses and wanted to avoid further losses in a declining market. Alan did not offer any evidence to corroborate this claim.

In closing argument, Alan claimed that his general assertion of loss-related IRA withdrawals corresponded to the $312,000 tax loss carryforward identified as a community asset in his trial brief. Alan's counsel asserted, "The remaining balance [in those investment accounts] would have been . . . in the tax loss carried forward . . . ." In other words, he argued that after subtracting Alan's expenditures for the community and for Elaine, all that remained in the investment accounts was $312,000, a sum that was lost in the market as "evidenced" by the $312,000 tax loss carryforward that existed at the time of trial.[6]

---

[5] The other asset disputes relevant to this appeal concern a $100,000 line of credit from Bank of America and Elaine's claim Alan unilaterally benefitted from a $46,500 payment for unused vacation received in 1995. Alan asserted both sums were used for the benefit of the community.

[6] The limited documentary evidence in the record belies Alan's counsel's assertion that the $312,000 tax loss carryforward explains what happened to the "remaining" community funds from 1999 onward, when Alan began the IRA withdrawals. According to the couple's joint tax

Elaine introduced evidence to prove the value of the investment accounts in Alan's control postseparation. She testified that, as the nonmanaging spouse, she had no personal knowledge or records of the value of the accounts at any particular time. But she offered into evidence as exhibit 18 a two-page document entitled "confidential personal financial statement" for "Alan/Elaine Margulis," dated February 1, 1999, reflecting total assets of $1,305,500. The itemized list of assets included $133,000 in a money market (identified on the second page as the Merrill Lynch account); $230,000 in the Charles Schwab IRA's; $424,000 in "marketable securities" (presumably the Sutro & Company account); real estate; and other investments. Alan admitted under cross-examination that he had prepared and signed this document in February 1999. Elaine's counsel argued the trial court should accept the values of the Merrill Lynch, Charles Schwab, and Sutro & Company accounts as stated on exhibit 18 unless Alan proved he properly disposed of those assets for community purposes or the stock holdings lost value due to market decline. In other words, Elaine argued the burden of proof should shift to Alan to *disprove* the values stated on exhibit 18 because he controlled those accounts and therefore was the only one with the personal knowledge or records to prove the value and disposition of the community funds postseparation. The trial court admitted exhibit 18 into evidence.

In closing argument, Alan's counsel argued exhibit 18 should be given "little weight" because Elaine presented no testimony explaining the document Alan created, and the document was unreliable because it failed to distinguish between community and separate property. Alan also argued exhibit 18 was outdated and therefore shed little light on the value of "the community assets present now."

The trial court ultimately did not rely on the account values listed in exhibit 18. The court explained, "I don't believe it supports, standing alone, [that] your assets listed did, in fact, exist." Without exhibit 18, the trial court had no evidence on the value of any specific investment accounts, except for the Charles Schwab IRA's. As for the IRA's, Charles Schwab account statements showed a combined value in December 1996 of $202,763, tax records reported Alan's withdrawal of $164,390 from those accounts in 1999–2001, and current account statements showed $20,000 remaining in the IRA's. Based on that evidence, the trial court charged Alan with $184,390 in IRA funds. The trial court made no findings on the value of the other investment accounts at separation or later, and did not charge Alan with any

records, in 1999 they already had a preexisting loss carryover of $299,717 from 1998. Moreover, the couple reported receiving approximately $1,570,000 in cash from their short— and long-term stock sales in 1999. Obviously, a market loss of $312,000 would not have wiped out investment accounts holding sales proceeds of that magnitude.

of those funds, impliedly accepting Alan's assertion that he spent the money from these accounts on the community and Elaine, and lost the remainder in market downturns.

The trial court also charged Alan with the $369,405 community cash he received from the desert property, life insurance policy, and severance pay. The trial court rejected Elaine's argument that Alan should be charged with the $100,000 Bank of America line of credit or the $46,500 for unused vacation, concluding Alan used both sums for the community's benefit.

*Evidence and Findings on Alan's Right to Reimbursement for Postseparation Payments*

The other major trial issue concerned Alan's right to be reimbursed from the community property for his postseparation payments on community debts or for Elaine's benefit. The parties stipulated that Dennis Sperry, a certified public accountant, would serve as the court's forensic accountant (Evid. Code, § 730) "to conduct a tracing and analysis of both parties' claims for credits" regarding postseparation payments on community property obligations or for the benefit of the other party. In the stipulation, the parties agreed to provide Sperry with all documents previously produced in discovery and to "cooperate with any reasonable requests" for additional information.

Sperry asked Alan to produce "[a]ll personal bank statements and check registers" for all bank accounts Alan held in his own name or jointly with another from the date of separation through the present. Sperry also asked for "[a]ll brokerage statements for any investments owned individually or jointly" for the same time period.

In response, Alan gave Sperry bank documents for only two accounts, Merrill Lynch and Chevy Chase, although he admitted at trial that he maintained various other community and separate property accounts and freely commingled them. The bank documents Alan provided for the two accounts were incomplete. He gave Sperry Merrill Lynch check registers but no bank statements. Alan provided check registers for the Chevy Chase account from September 10, 1998, through November 12, 2007, but the Chevy Chase bank statements he provided were from December 1, 1999, forward.

Alan gave Sperry no brokerage statements for the Sutro & Company, John Hancock, or Charles Schwab community investment accounts mentioned in

the tax records, or for Alan's own brokerage accounts, such as Raymond James or another account referred to in a check register as "LFG trading account."[7]

Despite Sperry's initial charge to "conduct a tracing" and analyze Alan's claim for reimbursement, his eventual report merely recorded and summarized all the checks listed on the Merrill Lynch and Chevy Chase check registers Alan provided. As Sperry explained at trial, he could not substantiate or disprove Alan's claim for reimbursement for postseparation payments because Alan failed to provide the complete documentation needed for such an analysis. Sperry conceded that his report shed little light on the validity of Alan's claim for credits.

Alan retained his own forensic accounting expert, Jack White, to testify on the issue of credits. White's report, accepted into evidence, purported to do what Sperry's did not: It stated the total amount of credits due Alan for postseparation payments made for the benefit of the community or Elaine. White testified that, based on the check registers and Alan's verbal "explanations," he tallied the checks Alan wrote from the Merrill Lynch and Chevy Chase accounts and characterized each payment as a community expense, Elaine's expense, or Alan's expense. In his report, White concluded that, postseparation, Alan paid $517,774.85 for community expenses, $25,387.56 for Elaine's separate expenses and $37,825 directly to Elaine. Adding these sums together, White concluded Alan should be credited with reimbursable payments totaling $580,987.

At trial, Elaine objected to White's testimony and report as lacking proper foundation. She argued White had no basis for concluding that particular payments were for the benefit of the community or her, and thus reimbursable, based merely on check registers and Alan's "explanations." She argued White could only conclude a payment was reimbursable if it was made from separate funds, and Alan admitted he commingled funds to such an extent that he could not trace the source of any payments. Consequently, she argued, the trial court should exclude White's opinion that Alan was due reimbursement for payments totaling $580,987.

The trial court overruled Elaine's objections. The trial court stated it found White's testimony persuasive and awarded Alan all the credits White recommended.

---

[7] When pressed at trial to explain his failure to produce these documents, Alan offered two excuses. First, he stated that when he moved to Chicago in 1996, he left all then existing financial records at the Sycamore house. Second, he testified that he did not keep financial records in his Chicago residence because he shared the house with three other men.

*The Findings on Alan's Breach of Fiduciary Duty*

The trial court specifically found Alan breached the fiduciary duty he owed to Elaine "to maintain proper records of all community assets which he had exclusive control and management over . . . ." The court noted that Alan, as managing spouse, "had the best knowledge of where the assets and accounts were located in spite of his protestations otherwise. . . . [H]ad [Alan] taken the opportunity to avail himself of the possibility of locating the documenta- tion . . . it might have enabled the financial experts to present a more detailed analysis of the financial issues in this matter." Instead, Alan produced few records and his failure to keep adequate records hampered the equitable disposition of assets: The court concluded that "the evidence is insufficient to support what really happened to these accounts." Accordingly, the trial court ordered Alan to pay Elaine $20,000 in sanctions for the breach of fiduciary duty and $30,000 as "a contributed share of [Elaine's] attorney fees and costs . . . ."

*The Property Division*

The trial court awarded the Sycamore house to Elaine, but ordered her to make an equalizing payment to Alan of $189,736, after subtracting the $50,000 he owed her for the sanctions and attorney fees. The court furthered ordered Elaine to sell the house if she could not make the equalizing payment in 45 days.

Elaine appealed from the judgment ordering her to make the equalizing payment or sell the house. Alan filed a cross-appeal from the finding he breached his fiduciary duty and from the resulting award to Elaine of sanctions and attorney fees.

II

DISCUSSION

A. *Elaine's Appeal*

Elaine argues the trial court erred in its community property division, both undervaluing the community assets chargeable to Alan and overcrediting him for payments purportedly made for the community's and Elaine's benefit. She is correct on both counts.

1. *The Trial Court Erred in Tallying the Community Assets Chargeable to Alan*

Elaine contends the trial court erred when it excluded from the community property chargeable to Alan the investment account funds he controlled

postseparation but which were unaccountably missing at time of trial. We agree the trial court erred in refusing to "count" these missing assets, and, more fundamentally, in refusing to shift the burden of proof to *Alan* to show the disposition and valuation of community assets in his control postseparation.

Though Alan never stated a value for the community investment accounts at separation or otherwise (except the Charles Schwab IRA's), the tax records he offered into evidence suggest that in 1996 these accounts likely held more than $1 million, and approximately $1.5 million in 1999.[8] Exhibit 18, which Alan prepared in early 1999, acknowledged the value of just three of the couple's accounts (Sutro & Company, Charles Schwab, and Merrill Lynch) stood at $787,000. Collectively, the brokerage and checking accounts were the most valuable community assets the couple owned. By the time of trial, however, Alan claimed that all that was left of this community property was a mere $20,000 in the Charles Schwab IRA's.

While the judgment did charge Alan with a portion of the IRA funds he had controlled—the $164,000 he admittedly removed and the $20,000 that remained—it made no provision for the rest of the community funds Alan had managed postseparation. The trial court was explicit about its reason for refusing to charge Alan with any of these other missing funds: Elaine's only proof that money was missing was exhibit 18, and the court considered the exhibit insufficient to establish the account values. The court stated: "I don't believe [exhibit 18] supports, standing alone, [that] your assets listed did, in fact, exist." The judgment further noted: "The court finds there was no showing as to the total amounts of funds available to [Alan] and it has not heard any evidence to support argument on [Elaine's] part that [Alan] should be charged with the receipt of" the community assets listed on exhibit 18.

In other words, the trial court concluded that Elaine, the nonmanaging spouse who lacked both personal knowledge and records concerning the assets listed on exhibit 18, failed to meet the difficult burden of proving these now missing assets had existed (i.e., that there had been $424,000 in Sutro & Company, $133,000 in Merrill Lynch, and $230,000 in Charles Schwab IRA's in 1999).

The trial court's failure to place the burden of proof on Alan relieved him of the duty to account for his postseparation management of these assets. Thus, Alan did not have to prove the *amounts* that had been in these accounts

---

[8] The Margulises' 1996 schedule D, the statement of their capital gains and losses, reported that between January and July 1996, they sold $1,142,111 worth of short- and long-term stock holdings, and two other long-term investments that generated another $68,091. Their 1999 schedule D reported sales of short- and long-term stock holdings totaling $1,570,150.

or that he had properly disposed of those sums. This lack of accountability poses a risk of abuse and runs afoul of the statutory scheme imposing broad fiduciary duties of disclosure and accounting on a managing spouse.

■ We thus adopt a rule advocated by amici curiae[9] but not fully articulated in any published case to date. We conclude that once a nonmanaging spouse makes a prima facie showing concerning the existence and value of community assets in the control of the other spouse postseparation, the burden of proof shifts to the managing spouse to rebut the showing or prove the proper disposition or lesser value of these assets. If the managing spouse fails to meet this burden, the court should charge the managing spouse with the assets according to the prima facie showing. As we explain in detail below, we find support for this rule in general case law explaining the circumstances and equitable principles that justify shifting the burden of proof, Family Code provisions that impose fiduciary duties of disclosure and accounting on spouses, and family law cases addressing the problem of missing community assets.

a. *Principles Governing the Decision Whether to Shift the Burden of Proof*

■ We begin by reviewing the principles relevant to deciding whether to shift the burden of proof on a particular issue. Ordinarily, "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500.) This general rule applies "[e]xcept as otherwise provided by law." (*Ibid.*) "[C]ourts may alter the normal allocation of the burden of proof" based on considerations of fairness and policy. (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1188 [78 Cal.Rptr.3d 572] (*Amaral*).)

Indeed, California courts consistently approve shifting the burden of proof where circumstances make it impossible for a plaintiff to prove his or her case as, for example, in the wage-and-hour context when employers' "inadequate records prevent employees from proving their claims for unpaid overtime hours [citation] and unpaid meal and rest breaks [citation]." (*Amaral, supra,* 163 Cal.App.4th at p. 1189; see also *Fowler v. Seaton* (1964) 61 Cal.2d 681, 687 [39 Cal.Rptr. 881, 394 P.2d 697] [applying res ipsa loquitur in case of small child injured at preschool].)

---

[9] In response to an invitation from this court, the Association of Certified Family Law Specialists and the Southern California Chapter of the American Academy of Matrimonial Lawyers have filed a joint amicus curiae brief. Amici curiae indicate in their brief that they do not write in support of any party in this case, but only to address an issue of concern to family law practitioners.

These burden-shifting decisions recognize that " 'determining the incidence of the burden of proof . . . ". . . *is merely a question of policy and fairness* based on experience in the different situations." ' [Citation.]" (*Adams v. Murakami* (1991) 54 Cal.3d 105, 120 [284 Cal.Rptr. 318, 813 P.2d 1348], original italics (*Adams*).) In deciding the issue, "Fundamental fairness must be the lodestar for our analysis." (*Id.* at p. 119.)

The factors relevant to the burden-shifting analysis are well established: " 'In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact.' [Citation.]" (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 660–661 [25 Cal.Rptr.2d 109, 863 P.2d 179].)

■ Given that "bedrock concerns" of "policy and fairness" drive the analysis (*Adams, supra,* 54 Cal.3d at p. 120), it is not surprising that a common trigger for burden-shifting is "when the parties have unequal access to evidence necessary to prove a disputed issue. ' "Where the evidence necessary to establish a fact essential to a claim lies peculiarly within the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence on the issue although it is not the party asserting the claim." [Citations.]' [Citation.]" (*Amaral, supra,* 163 Cal.App.4th at p. 1189; see also *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 35 [130 Cal.Rptr.2d 860] ["where essential financial records are in the exclusive control of the defendant who would benefit from any incompleteness, public policy is best served by shifting the burden of proof to the defendant, thereby imposing the risk of any incompleteness in the records on the party obligated to maintain them"].)

■ Concerns over "unequal access to evidence" (*Amaral, supra,* 163 Cal.App.4th at p. 1189) are particularly pressing in the context of a marital dissolution where financial records can be crucial to ensuring the equal division of property required by Family Code section 2550. (All further statutory references are to the Family Code unless otherwise indicated.) Undoubtedly, in marriages and separations like the Margulises' where one spouse exercised exclusive control over community property, the parties will have vastly *unequal* access to evidence concerning the disposition of that property. When this occurs, fairness requires shifting to the managing spouse the burden of proof on missing assets. Moreover, as explained in the next part, the statutory fiduciary duties of disclosure and accounting owed between spouses further justify that result.

### b. *Fiduciary Duties of Disclosure and Accounting Under the Family Code*

Family Code provisions detailing the fiduciary obligations between spouses provide strong support for shifting the burden of proof to the managing spouse when determining the value and disposition of missing assets. The starting point is section 721, which provides that accountability for the management of community assets is a fundamental aspect of the fiduciary duties owed between spouses.

Section 721, subdivision (b), states, in relevant part: "[I]n transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, including, but not limited to, the following: [¶] (1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying. [¶] (2) Rendering upon request, true and full information of all things affecting any transaction which concerns the community property. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions. [¶] (3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse which concerns the community property."

Section 721, subdivision (b)'s specific incorporation of "the same rights and duties of nonmarital business partners, as provided in" section 16403 of the Corporations Code, makes clear that the duty to disclose relevant information concerning transactions affecting the community property is an affirmative and broad obligation. Corporations Code section 16403 requires each partner to "furnish to a partner . . . [¶] (1) *Without demand*, any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partner's rights and duties under the partnership agreement or this chapter . . . ." (Corp. Code, § 16403, subd. (c), italics added.)

Section 1100 further delineates the scope of a managing spouse's accountability. That statute not only prohibits a spouse from engaging in certain conduct, such as making a unilateral gift of community personal property or disposing of it "for less than fair and reasonable value, without the written

consent of the other spouse" (§ 1100, subd. (b)), but it also requires each spouse to act as a fiduciary toward the other in the management of community assets "in accordance with the general rules governing fiduciary relationships . . . as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest . . . ." (§ 1100, subd. (e).)

Importantly, section 1101 creates a right of action and specific remedies for the breach of fiduciary duty between spouses. Subdivision (a) of section 1101 gives each spouse "a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate . . . ." The statutory remedies for a breach of fiduciary duty, specifically including a breach of "those [duties] set out in Sections 721 and 1100," include a mandatory award of 50 percent "of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs. . . ." (§ 1101, subd. (g).) If the nondisclosure or wrongful disposition of community property "falls within the ambit" of Civil Code section 3294 (punitive damages upon clear and convincing evidence of oppression, fraud or malice), the court must award to the injured spouse the entire value of the asset (§ 1101, subd. (h)).

Finally, section 2100 makes clear that these fiduciary obligations of disclosure and accounting continue to bind spouses after separation until final distribution of assets. Section 2100 states: "[A] full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest must be made in the early stages of a proceeding for dissolution of marriage or legal separation of the parties . . . . Moreover, each party has a continuing duty to immediately, fully, and accurately *update* and *augment* that disclosure to the extent there have been *any material changes* so that at the time the parties enter into an agreement for the resolution of any of these issues, or at the time of trial on these issues, each party will have a full and complete knowledge of the relevant underlying facts." (§ 2100, subd. (c), italics added; see also § 2102, subd. (a)(1) [from date of separation to date community assets are distributed, spouses are subject to § 721's fiduciary duty to disclose assets and update material changes].) Section 2107, subdivision (c), mandates an award of sanctions, including reasonable attorney fees, against a spouse who fails to comply with these fiduciary duties of disclosure and accounting. (§ 2107, subd. (c); *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1477 [64 Cal.Rptr.3d 29] (*Feldman*).)

Taken together, these Family Code provisions impose on a managing spouse affirmative, wide-ranging duties to disclose and account for the

*existence, valuation,* and *disposition* of all community assets from the date of separation through final property division. These statutes obligate a managing spouse to disclose soon after separation all the property that belongs or might belong to the community, and its value, and then to account for the management of that property, revealing any material changes in the community estate, such as the transfer or loss of assets. This strict transparency both discourages unfair dealing and empowers the nonmanaging spouse to remedy any breach of fiduciary duty by giving that spouse the "information concerning the [community's] business" needed for the exercise of his or her rights (Corp. Code, § 16403, subd. (c)(1); see Fam. Code, § 721, subd. (b)), including the right to pursue a claim for "impairment to" his or her interest in the community estate (§ 1101, subds. (a), (g) & (h)). And most importantly for present purposes, in a trial where community assets are missing, these statutory duties of disclosure and accounting serve to shift the burden of proof on missing assets to the managing spouse.

We find support for this crucial shift of the burden of proof in the recurring mandate, running throughout the statutory scheme, that the managing spouse must furnish information to the other spouse concerning the community property. For example, various statutes require the managing spouse to make "full and accurate disclosure of all [community] assets" (§ 2100, subd. (c)) and "of all material facts . . . regarding the existence, characterization, and valuation" of those assets (§ 1100, subd. (e)), and to "immediately, fully, and accurately update and augment" that disclosure (§ 2100, subd. (c)). Collectively, these provisions impose a sua sponte duty on the managing spouse to advise the nonmanaging spouse of the *existence* and *value* of the community property. (See *Feldman, supra,* 153 Cal.App.4th at p. 1488 ["Aaron had a fiduciary duty to disclose the existence of the 401(k) account . . . in the first place without prodding from Elena . . . ."]; *In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1347–1348 [113 Cal.Rptr.3d 849] [managing spouse had affirmative duty to acquire and disclose information concerning value of community pension plan].)

These Family Code statutes impose a similar sua sponte duty on the managing spouse to furnish information concerning the *disposition* of community assets. For example, section 721 requires a spouse to produce "full information of all things affecting any transaction which concerns the community property" (§ 721, subd. (b)(2)), to "[a]ccount[] to the [other] spouse, and hold[] as a trustee, any benefit or profit derived from any transaction . . . which concerns the community property" (§ 721, subd. (b)(3)), and to furnish "[w]*ithout demand,* any information concerning the [community's] business" that the other spouse requires for the exercise of his or her rights (Corp. Code, § 16403, subd. (c)(1), italics added; see Fam. Code, § 721, subd. (b)). (See *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 296 [39 Cal.Rptr.2d 673] (*Haines*) [§ 721 is a statute "of mutual accountability, requiring each

spouse to show his or her conduct in connection with an interspousal transaction conformed to the legal standard" applicable to fiduciaries].)[10]

■ These substantial sua sponte duties of disclosure and accounting bind the managing spouse until the community property is divided. (§§ 2100, subd. (c), 2102, subd. (a)(1).) It follows, then, that these statutory duties can play a significant role at a trial to divide the property. In a situation like the present case, where the nonmanaging spouse makes a prima facie showing that community assets are missing, that showing implicates the managing spouse's duty to "update and augment" disclosure as .to "any material changes" in the community property. (§ 2100, subd. (c).) In fact, section 2100 states that the purpose of this continuing disclosure requirement is "so that . . . at the time of trial on these issues, each party will have a full and complete knowledge of the relevant underlying facts." (§ 2100, subd. (c).) That statutory purpose is served, and the duty to account enforced, by placing the burden of proof to account for missing assets on the managing spouse.

---

[10] *In re Marriage of Walker* (2006) 138 Cal.App.4th 1408 [42 Cal.Rptr.3d 325] (*Walker*) explains that although certain language in section 721, subdivision (b), suggests the spousal duty of disclosure depends upon a "request" for information, the legislative history of the statute compels a contrary conclusion. (See *Walker*, at pp. 1419–1428.) Walker cites the ambiguity created by subpart (2) of subdivision (b) of the statute, which lists as one of the fiduciary duties of a spouse "[*r*]*endering upon request*, true and full information of all things affecting any transaction which concerns the community property. . . ." (§ 721, subd. (b)(2), italics added.) The "upon request" language in that subpart conflicts with subdivision (b)'s broader requirement that spouses act in conformity with the fiduciary duties of nonmarital business partners "as provided in [Corporations Code] Sections 16403, 16404, and 16503," including the duty to furnish "[*w*]*ithout demand*, any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partner's rights and duties under the partnership agreement or this chapter . . . ." (Corp. Code, § 16403, subd. (c)(1), italics added.)

*Walker* reviewed the legislative history of section 721 and, specifically, the 2002 amendment of the statute which "define[d]" the rights and duties of spouses by incorporating "the Corporations Code sections enacted in 1996," i.e., Corporations Code sections 16403, 16404, 16503. (*Walker, supra*, 138 Cal.App.4th at p. 1427.) The court reasoned that because these Corporations Code sections "impose a duty on partners to furnish each other *without demand* 'any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partner's rights and duties. . . .' [citation]," the Legislature intended by this amendment to create "a new obligation . . . imposing, for the first time, a specific requirement that a spouse convey certain information about the partnership's, i.e., community's, affairs, even if the other spouse has not requested this information . . . ." (*Walker, supra*, at p. 1427, original italics.) Consequently, the *Walker* court concluded section 721, subdivision (b), imposes a sua sponte duty of disclosure on the managing spouse, but declined to apply the statute retroactively in that particular case because it would be unfair. (*Walker, supra*, at p. 1428 [though wife failed to advise husband of depletion of funds in community IRA account, it was undisputed she used the funds for community purposes; moreover, all undisclosed withdrawals occurred before the effective date of the amendment to § 721, subd. (b)]; see also *Feldman, supra*, 153 Cal.App.4th at p. 1488 [managing spouse had duty under §§ 721, subd. (b), and 1101, subd. (e), to disclose assets "without prodding"].)

This discussion brings us back to the evidentiary problem at the heart of this case. The evidence at trial showed that Elaine, as the nonmanaging spouse, had no personal knowledge of the extent of the community assets at separation; nor had she personal knowledge of how Alan handled those assets in the ensuing years. Elaine offered exhibit 18 to show that substantial community assets under Alan's control had disappeared between separation and trial. Although the trial court found Elaine had satisfied the requisite foundation to admit the exhibit, which Alan conceded he prepared, the court accorded the document little or no weight because Elaine had no evidence to support it. Consequently, the trial court concluded Elaine failed to carry her burden of proving the accounts itemized in exhibit 18 ever had the *values* listed in that document. Having rejected Elaine's proof of the *values* of these investment accounts, the trial court excused Alan from his duty to account for those sums. Alan instead painted a general picture of legitimate expenditures and losses that wiped out all of the couple's investment money, leaving no "missing" funds chargeable to Alan (except for the funds in the Charles Schwab IRA's). But, as discussed above, the trial court misapplied the burden of proof.

Elaine's introduction of exhibit 18 satisfied her initial burden to show that Alan controlled community assets of a certain value postseparation. The statutory fiduciary duties of disclosure and accounting then effectively shifted the burden to Alan to rebut the presumption charging him with the assets listed on exhibit 18, a document that constituted prima facie evidence of the account values it stated.[11] The trial court erred in failing to shift this burden of proof to Alan.

This error significantly harmed Elaine's case. The court's failure to shift the burden may have excluded from the property division a substantial pool of community assets.[12] It also improperly curtailed the trial court's analysis

---

[11] Another way to state this evidentiary burden is that Elaine's prima facie evidence that Alan controlled $787,000 worth of community funds in 1999 created a rebuttable presumption of the value of those funds and that Alan misappropriated or wrongfully transferred the now-missing funds. " 'A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action.' [Citation.] The trier of fact is required to assume the existence of the presumed fact 'unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' [Citation.]" (*Haines, supra,* 33 Cal.App.4th at pp. 296–297.)

[12] The trial court's rejection of the exhibit 18 asset values effectively deleted $602,610 from the property division. According to exhibit 18, in 1999 the couple had $133,000 in the Merrill Lynch account, $424,000 in the Sutro & Company account, and $45,610 more in the Charles Schwab IRA's than the trial court charged to Alan (exhibit 18 stated a Charles Schwab account value of $230,000, but the court charged Alan with only $184,390 of that sum), for a total of $602,610 excluded from the property division.

of Alan's alleged breach of his fiduciary duties. As mentioned above, the trial court did not hold Alan to account for the investment sums listed in exhibit 18 because Elaine failed to prove the accuracy of the asset values stated in the exhibit. The court therefore failed to require Alan to trace the missing money to proper expenditures to determine whether he had "take[n] any unfair advantage of" Elaine. (§ 721, subd. (b).) Nor did the trial court hold Alan to his duty to "update" Elaine as to the "material changes" in the community estate that occurred between the date Alan prepared exhibit 18 in 1999 and the date of trial. (§ 2100, subd. (c).)

Instead, the trial court found a single, narrow breach of duty by Alan: a breach of the duty "to maintain proper records of all community assets" within his exclusive control. Though the evidence supports this finding, the trial court's failure to consider whether Alan also breached additional fiduciary duties of disclosure and accounting was an error tied to its erroneous decision on the burden of proof. And in failing to consider other possible breaches of fiduciary duty, the trial court may have deprived Elaine of her right to recover damages under section 1101, subdivisions (g) and (h) for "any asset undisclosed or transferred in breach of the fiduciary duty . . . ."

Thus, this case illustrates the importance of shifting to the managing spouse the burden of proof on missing assets. It also illustrates how shifting this burden of proof furthers the statutory purposes of requiring complete transparency and accountability in the management of community assets and of providing a remedy to the nonmanaging spouse when a breach of that fiduciary duty occurs.

c. *Cases Addressing the Problem of Missing Community Assets*

Although there is a lack of case law addressing the specific problem of proof this case presents, three cases lend support to our conclusion that the managing spouse should bear the burden of proving the proper disposition of missing assets if the nonmanaging spouse makes the requisite prima facie showing. Of these three opinions, two reversed trial court judgments which failed to take into account missing assets in the division of marital property, thereby clarifying the trial court's duty to make findings on all community assets under a spouse's control postseparation. (See *Williams v. Williams* (1971) 14 Cal.App.3d 560 [92 Cal.Rptr. 385] (*Williams*); *In re Marriage of Ames* (1976) 59 Cal.App.3d 234 [130 Cal.Rptr. 435] (*Ames*).) The third opinion, *In re Marriage of Valle* (1975) 53 Cal.App.3d 837 [126 Cal.Rptr. 38] (*Valle*), affirmed a judgment that charged the managing spouse with missing property because he failed to prove its proper disposition. In other words, *Valle* shifted the burden of proof to the managing spouse to show the proper disposition of community property—a key aspect of the approach we adopt

here. While none of these three cases addresses the added problem of proving the *value* of missing assets, they provide support for the burden-shifting approach we adopt.

The rationale for shifting the evidentiary burden concerning missing assets to the managing spouse arises from the simple fact that an accounting of all community property is required so the court may divide it equally. In *Williams, supra*, 14 Cal.App.3d 560, the appellate court reversed an interlocutory judgment dividing the community property because the trial court failed to include missing assets in the property division, the same failure that occurred here when the court erroneously rejected Elaine's prima facie showing and required no rebuttal by Alan.

The husband and wife in *Williams* were married almost 13 years when, with divorce imminent, the husband withdrew $110,489.26 from community accounts ($39,251.50 from savings and $73,237.76 from a stock fund). (*Williams, supra*, 14 Cal.App.3d at p. 563.) An accountant appointed to audit the couple's financial records was unable to trace $49,363 of the withdrawn funds, and the accountant could not determine whether the husband spent the balance on community or separate debts. The trial court made no findings concerning the $110,489.26, and disregarded it in dividing the community estate. The appellate court reversed, agreeing that in failing to require the husband to account for the missing funds, the trial court failed to perform its duty "to equally divide the community property." (*Id.* at p. 564.)

The court noted, "The $110,489.26 in dispute here was intact immediately prior to the filing of the action. Under these circumstances, the husband would obtain 'an unfair advantage' over his wife if he is not required to account for that portion of the money which was community property and to reimburse the wife for her share of any of the community property not shown to have been used for community purposes." (*Williams, supra*, 14 Cal.App.3d at p. 567.) The court remanded for a "retrial of the issue of community property . . . includ[ing] all sums of money received and disposed of by the husband . . . when the divorce action was imminent." (*Id.* at p. 568.)

*Ames, supra*, 59 Cal.App.3d 234 is the second case where the court reversed a partial judgment dividing community property because the trial court failed to award the nonmanaging spouse her share of missing community funds. *Ames* concluded the trial court abused its discretion in finding the husband "had properly accounted for $24,655 of community property." (*Id.* at p. 237.) The appellate court found, through its own "most benign reading of an incredibly vague record," that the husband "failed to sustain his burden [to account for community funds] by a very large amount." (*Id.* at fn. 4.) Specifically, the court concluded "about $9,000 [remains] unexplained by

George." (*Id.* at p. 237.) Though the discussion in *Ames* is relatively cryptic, the lesson is clear: A judgment for marital dissolution must take into account all community property in a spouse's management and control postseparation, and the property's "disappearance" at time of trial does not excuse the court from making the necessary findings on its disposition.

Significantly, Justice Thompson's concurrence in the *Williams* case sought to provide the trial court with additional guidance rather than merely remanding the matter with instructions to make findings on the missing funds. Unlike the majority, Justice Thompson viewed "the question" in *Williams* as "one of burden of proof and of producing evidence." (*Williams, supra,* 14 Cal.App.3d at p. 568 (conc. opn. of Thompson, J.).) He explained his reasoning as follows: "In a dispute over disposition of property in a divorce action, the wife has the burden of proof of establishing the existence of community property, and except as she may be aided by presumptions must produce evidence which carries that burden. [Citations.] [¶] Where, as here, the wife has concededly established the existence of community assets, has established that certain of those assets are missing, and has presented evidence from which it may be inferred that the husband wrongfully disposed of them, she has, in my opinion, met her burden of proof. The issue then shifts to the validity of dispositions of community property by the husband. On that issue, whether dispositions of community property by the husband are proper on the one hand or fraudulent or illegal on the other, I think the better rule would place the burden of producing evidence of the nature of the dispositions upon the husband." (*Id.* at pp. 568–569.)

Justice Thompson cited the equitable "principle of burden based upon superior knowledge of the facts" as justification for shifting to the managing spouse the burden of proof on the "unexplained disappearance of community funds . . . ." (*Williams, supra,* 14 Cal.App.3d at p. 569 (conc. opn. of Thompson, J.), citing *See v. See* (1966) 64 Cal.2d 778, 784 [51 Cal.Rptr. 888, 415 P.2d 776].) Justice Thompson explained: "It is appropriate to place the burden of producing evidence upon the party who has access to the facts where those facts are inaccessible to the other party to the litigation. [Citation.] . . . [T]he husband, as manager and controller of the community property, has access to the facts from which it may be determined whether a disposition of community assets by him was proper or improper. Conversely, the wife, as the [nonmanaging spouse] has little if any access to those facts." (*Williams,* at p. 569.)

Although no published case has adopted the concurring view in *Williams,* the opinion in *Valle, supra,* 53 Cal.App.3d 837 implicitly endorsed the burden-shifting approach Justice Thompson advocated. In *Valle, supra,* 53 Cal.App.3d 837, the husband appealed the community property division,

arguing the trial court improperly charged to him the value of the community's automobile and Mexican realty which he lost in satisfaction of community debts. (*Id.* at p. 844.) In affirming the judgment, the appellate court approved the trial court's decision to place upon the husband the burden of proving the proper disposition of these two community assets.

The *Valle* court explained its reasoning as follows: "The uncontroverted evidence discloses that these items were community property and were in Manuel's possession [at] the time of separation. Under these circumstances it was incumbent upon Manuel to persuade the trial court that the assets in dispute had been lost by reason of discharging community debts [citation]. The record, however, is consistent with the conclusion, implicit in the court's ruling, that Manuel fell short of sustaining the burden of proof. Although he testified at the trial that the Pontiac automobile had been given to his brother in return for a loan . . . and that the real property had been lost due to default in making the monthly payments thereon, he failed to substantiate these allegations in any manner. . . . In this situation, the trial court was fully justified in disregarding Manuel's uncorroborated testimony and in including the assets in question in the community. property." (*Valle, supra*, 53 Cal.App.3d at p. 844.)

■ Although *Valle* provides support for placing the burden of proof on the managing spouse to show the disposition of missing community assets, it is Justice Thompson's concurrence in *Williams* that best articulates the equitable basis for shifting the burden of proof, namely, the "principle of burden based on superior knowledge of the facts . . . ." (*Williams, supra*, 14 Cal.App.3d at p. 569 (conc. opn. of Thompson, J.).) Here, Alan, as managing spouse, had full access to the facts concerning the disposition of funds in the community accounts, both as to his own withdrawals and expenditures and the purported losses from stock market downturns. Elaine had neither personal knowledge nor access to records establishing those facts. Alan's superior knowledge of the disposition and value of the accounts in his control require that he bear the burden of proof on both issues.

Alan objects to this burden-shifting approach, arguing that it erroneously presumes the managing spouse breached a fiduciary duty from the "mere" fact that assets are missing at time of trial. Alan argues a managing spouse should not be charged with missing assets unless there is evidence of mismanagement or misappropriation. But there is no statutory or equitable basis for imposing such a prerequisite on the nonmanaging spouse before shifting the burden of proof to the managing spouse. As a practical matter, Alan's proposal increases the risk of an unfair property division because a nonmanaging spouse who lacks personal knowledge or records of the disposition of missing community assets would find it extremely difficult to

make the initial showing of mismanagement or fraud to shift the burden of proof. No sound policy reason supports the adoption of Alan's proposed rule; indeed, the rule would contradict a managing spouse's obligation to provide the full disclosure and accounting owed to a nonmanaging spouse.

As authority for requiring a predicate showing of fraud or mismanagement before shifting the burden of proof, Alan cites *Bono v. Clark* (2002) 103 Cal.App.4th 1409 [128 Cal.Rptr.2d 31] (*Bono*). The case does not persuade us to adopt the rule he proposes.

In *Bono, supra,* 103 Cal.App.4th 1409, the husband and wife separated in 1994 and their dissolution action was still pending in 1998, when the husband died. The wife sued her husband's estate for declaratory relief, asserting she was entitled to her one-half share of certain personal property assets of the community that the husband controlled at separation, but were missing from the estate inventory list. The assets consisted of approximately $25,000 worth of "livestock (11 or 12 cows and four horses)" and a few vehicles. (*Id.* at p. 1429.) At trial, the wife argued her husband must have disposed of the assets in violation of his fiduciary duties under the Family Code. The trial court rejected the wife's claim for half of the missing assets, finding she "failed to carry her burden of proving decedent's breach of fiduciary duty." (*Id.* at pp. 1429–1430.)

The Court of Appeal affirmed on the ground that the wife "offered no evidence" showing her husband "had disposed of the items in contravention of his fiduciary duties" and "[t]he mere absence of the assets four years after separation is insufficient to raise an inference that decedent disposed of them inappropriately. With respect to the cows and horses, for example, it might be equally reasonable to infer that they had died in the intervening years." (*Bono, supra,* 103 Cal.App.4th at p. 1430.)

We believe *Bono* has limited applicability here, given its unusual circumstances involving an action against an *estate* for missing livestock and farm vehicles. The equitable principle of burden based on superior knowledge did not apply because the managing spouse had died, leaving the estate at a disadvantage in explaining what had happened to the livestock and vehicles. Thus, *Bono* does not support Alan's argument that proof of mismanagement or fraud should be a prerequisite to shifting the burden of proof on missing community assets to the managing spouse.

 Alan's other arguments similarly lack merit. First, he argues that allowing Elaine to use exhibit 18 as prima facie evidence of the value of the assets that should be charged to him violates the rule that, for purposes of marital property division, assets should be valued as near as practicable to

time of trial, citing section 2552, subdivision (a). Alan's argument ignores subdivision (b) of that statute, which allows the trial court to use an alternate valuation date where fairness requires. (See *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 625 [108 Cal.Rptr.2d 833] [court has broad discretion to determine valuation date to accomplish equitable division]; *In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1435 [28 Cal.Rptr.2d 726] [same].)

Alan's argument also ignores the statutory remedies for breach of fiduciary duty in the management of community property set forth in section 1101. That statute mandates that, for purposes of awarding the injured spouse 50 percent of the value of an undisclosed or wrongfully transferred asset (or 100 percent, in the event of oppression, fraud, or malice), the trial court must value the assets at the *highest* of three possible dates: "The value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court." (§ 1101, subd. (g).) These statutes clearly authorize a trial court to use a valuation date that best provides adequate compensation to the injured spouse.

Alan's reliance on *In re Marriage of Priddis* (1982) 132 Cal.App.3d 349 [183 Cal.Rptr. 37] is likewise fruitless. Alan cites *Priddis* for the proposition that "the mere passage of time alone between the dates of separation and trial is an insufficient basis for setting the valuation date at a time other than 'as near as practicable to the time of trial.' " (*Id.* at p. 358.) The present case, however, involves more than simply "the mere passage of time," as was the case in *Priddis*. Instead, Elaine points to the unexplained postseparation disappearance of substantial community funds as apt justification for an alternate valuation date.

Finally, Alan argues that shifting to the managing spouse the burden of proof on the disposition of missing assets is overly burdensome in the circumstances of a long separation, such as the 12-year separation involved here, and it conflicts with section 721's admonition that "[n]othing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions." (§ 721, subd. (b)(2).) The argument lacks merit.

Requiring a managing spouse to account for the disposition of missing assets does not entail a "detailed" accounting. To the contrary, the managing spouse simply must show by competent evidence management of assets in his or her control in accord with the fiduciary obligations set forth in sections 721 and 1100. The trial court undoubtedly will take into account the length of the separation and the attendant difficulties of proof in determining whether the account made is satisfactory.

Nevertheless, it remains clear that the duty to account for the disposition of community property exists from separation to final distribution of assets. (§§ 1100, subd. (e), 2100, subd. (c), 2102, subd. (a)(1).) The duty to account does not dissipate over the course of an unusually long separation. Weighing equities, the property in issue belongs to both spouses and the nonmanaging spouse's right to an accounting outweighs the burden on the managing spouse to account.

We do not address Elaine's specific challenges to the trial court's finding that Alan should not be charged with possession of two other community assets, a payment of $46,500 for unused vacation and $100,000 proceeds from a Bank of America line of credit. We need not discuss these issues because the trial court's erroneous placement of the burden of proof as to the disposition of assets necessitates a complete retrial of the community property issues.

### 2. The Trial Court Erred in Reimbursing Alan from the Community Property for Postseparation Payments

Elaine contends the trial court erred in ordering that Alan be reimbursed from community property a total of $580,987 for payments he made for the benefit of the community and Elaine after separation. She contends the trial court improperly relied on opinion testimony from Alan's expert, Jack White, which she moved to strike as lacking a proper basis. (See Evid. Code, § 803.) Elaine's argument has merit.

 In the seminal case of *In re Marriage of Epstein* (1979) 24 Cal.3d 76 [154 Cal.Rptr. 413, 592 P.2d 1165] (*Epstein*), superseded by statute on other grounds, the California Supreme Court recognized a spouse's right to reimbursement from community property for payment of postseparation community expenses from the spouse's *separate* funds. The high court adopted the view expressed in *In re Marriage of Smith* (1978) 79 Cal.App.3d 725 [145 Cal.Rptr. 205] (*Smith*), as follows: " '[A]s a general rule, a spouse who, after separation of the parties, uses earnings or other separate funds to pay preexisting community obligations should be reimbursed therefor out of the community property upon dissolution . . . .' " (*Epstein*, at p. 84, quoting *Smith*, at p. 747.) Conversely, if the managing spouse uses community money to pay a community obligation, there is no basis for reimbursing the spouse for that payment. (See *Smith*, at p. 744 [judgment reimbursing husband for postseparation payments on community debts reversed because "there is no showing these payments by husband were made with his separate funds"; court ordered retrial rather than entry of judgment for wife because evidence suggested "some of the funds paid came from husband's . . . separate property"].)

White's opinion lacks a proper basis because White testified that Alan was entitled to reimbursement from the community property for postseparation payments without knowing whether Alan used his *separate* funds to make the payments in issue. In fact, Alan himself admitted it would be impossible to trace his payments to either a community or separate property source because after the separation he freely commingled community property with separate property in his various checking accounts.

Consequently, in his testimony and report, White did not trace individual payments to separate property sources. Rather he simply concluded Alan was entitled to reimbursement for particular payments based on the nature and *purpose* of the payment. In other words, if White determined a payment was for the benefit of either the community or Elaine, based on the corresponding check register entry and Alan's explanation, then he concluded Alan should be reimbursed. But the *purpose* of a payment is only part of the equation. As *Epstein* and *Smith* make clear, the *source* of the postseparation payment is crucial. A spouse is entitled to reimbursement for payment of community obligations only if those payments are made from the spouse's separate property.

Because there is no evidence Alan's postseparation payments for the community or for Elaine came from separate funds, we must reverse the judgment giving Alan a substantial credit for those payments in the community property division. (*Smith, supra*, 79 Cal.App.3d at p. 744.) On remand, the trial court must limit any reimbursement to payments that Alan proves came from separate property.

We note that Alan's evidentiary burden on retrial will be difficult because he commingled community and separate property funds. Commingling creates a rebuttable presumption that all the funds in the account are community property. "[T]he mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. [Citation.] But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of section 760. [Citation.]" (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 822–823 [53 Cal.Rptr.2d 179].)

Of course, a spouse who has commingled community and separate funds can defeat the presumption with evidence, employing traditional family law tracing methods, such as direct tracing or the family expense method of

tracing. (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 612 [122 Cal.Rptr. 79, 536 P.2d 479]; *In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1058–1059 [104 Cal.Rptr.2d 920].) Thus, to obtain reimbursement for any postseparation payments made from his commingled accounts, Alan should employ one of these tracing methods.

Tracing undoubtedly will raise additional questions concerning whether Alan owed the community reimbursement for his apparent use of community funds for separate purposes. (See *Epstein, supra,* 24 Cal.3d at p. 89 ["trial court erred in failing to charge husband's share of the community property for" funds withdrawn to pay his separate expenses].) For example, the Merrill Lynch check registers indicate Alan transferred approximately $37,000 of community funds from that account into either his separate accounts or unidentified accounts. On remand, the trial court can deal with all such reimbursement issues.[13]

Elaine raises another challenge to the trial court's order granting Alan credits for postseparation payments. She contends the court failed to make the necessary finding under *Epstein* on whether Alan made any part of the payments "in discharge of his support obligation . . . ." (*Epstein, supra,* 24 Cal.3d at p. 86.) *Epstein* held that otherwise reimbursable postseparation payments made from separate property may not be reimbursed if "such sums were paid to fulfill [the spouse's] support obligations." (*Id.* at p. 80.)

Alan argues Elaine waived the issue of "*Epstein* credits" by failing to raise it in the trial court. We need not resolve the issue of waiver, however, because reversal is required for insufficiency of the evidence, as discussed above. On remand, the trial court must make the necessary findings identified in *Epstein,* including whether the parties "entered into an 'agreement' for support . . . and whether husband should be estopped . . . from denying that his payments were in discharge of his duty to support." (*Epstein, supra,* 24 Cal.3d at p. 86, fn. omitted.)

## B. *Alan's Cross-appeal*

In his cross-appeal, Alan challenges the trial court's finding that he breached his fiduciary duty "to maintain proper records of all community

---

[13] Of course, careful tracing may also reveal additional community property subject to division. For example, the Merrill Lynch check registers reflect Alan transferred $25,000 of community funds into the "LFG trading account," and used another $4,000 of these community funds for "MP Stock purchase." White's report identified both expenditures as Alan's separate expenses, based on Alan's explanation. Other documentary evidence suggests Alan's separate Raymond James brokerage account may include funds from various community accounts; in fact, Alan's trial brief refers to the Raymond James account as a community property account.

assets" within his exclusive control, and the award to Elaine of sanctions and attorney fees for that breach. The cross-appeal is moot, however. The trial court's error in failing to shift the burden of proof on missing assets to Alan affected not only the court's division of community property, but also its analysis of the scope of Alan's alleged breach of his fiduciary duties under the Family Code. (See *ante*, pt. IIA.1.b.) Upon remand, the trial court will necessarily retry the issue of Alan's alleged breach of fiduciary duties and revisit the question of the appropriate statutory remedies for any breach of duty it finds.

## III

### DISPOSITION

The judgment is reversed. Elaine is entitled to her costs on appeal.

Bedsworth, Acting P. J., and O'Leary, J., concurred.

On August 26, 2011, and September 9, 2011, the opinion was modified to read as printed above.