Filed 10/31/13  Marriage of James and Christine C. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of JAMES and CHRISTINE C. | |
| JAMES C., Respondent, v. CHRISTINE C., Appellant. | G047124 (Super. Ct. No. 04D004230) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James L. Waltz, Judge.  Affirmed.  Motion for sanctions for frivolous appeal.  Denied.

Victor B. Meyen for Appellant.

John L. Dodd & Associates, John L. Dodd; Fisher & Rich and Michael Fisher for Respondent.

\*          \*          \*

Christine C. and James C.[1] were married in 1989 and separated in 2004. James filed a petition for dissolution of marriage in May 2004. Christine appeals from a judgment on reserved issues entered in May 2012. She contends:

1. The trial court erred by setting the date of valuation of a community business, C. & Associates, as of the date of separation instead of the date of trial.

2. The trial court erred by finding Christine had failed to present prima facie evidence that James breached his fiduciary duties and misappropriated community property. Related to that contention, Christine argues the trial court erred by concluding *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252 (*Margulis*) was inapplicable and by "refusing to apply" (capitalization & underscoring omitted) the holding in *In re Marriage of Haines* (1995) 33 Cal.App.4th 277 (*Haines*).

3. The trial court abused its discretion by not awarding her a larger amount of attorney fees than granted.

We disagree with each of these contentions and affirm. After hearing days of testimony, the trial court did a commendable job of preparing thorough findings on the issues of date of valuation and breach of fiduciary duties. Those findings are supported by overwhelming evidence, and the trial court's conclusions based on those findings are legally correct. The trial court carefully considered Christine's attorney-fee-shifting motion and, again making thorough findings, reached a fair and sensible award.

The only real issue in this case is whether to grant James's motion for sanctions against Christine and her appellate counsel for a frivolous appeal. After careful consideration of the matter, we decline to impose sanctions on appeal.

---

[1] We use the parties' first names for clarity and ease of reference, not out of disrespect. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2.)

## FACTS AND PROCEDURAL HISTORY

Christine and James were married on February 10, 1989. They separated on May 6, 2004, and James filed a petition for dissolution of marriage one week later. Christine and James have one child from their marriage. Christine also has an adult son from a prior marriage.

James is a physician. In 1996, he formed C. & Associates, a business that performs medical review for health care payers, such as health insurance companies and self-insured, ERISA-based (Employee Retirement Income Security Act of 1974; 29 U.S.C. § 1001 et seq.) plans. C. & Associates is a sole proprietorship. James's expert, certified public accountant Glenn Mehner, valued C. & Associates at $557,000 as of the date of separation.

The first trial resulted in a judgment of dissolution with an addendum on reserved issues that was entered in March 2006. We reversed that judgment in *In re Marriage of James & Christine C.* (2008) 158 Cal.App.4th 1261 (*C. I*), on the ground the trial court erred by denying Christine's request for a trial continuance as an Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) accommodation under California Rules of Court, rule 1.100.

In February 2009, following remand from *C. I*, the trial court, on its own motion, bifurcated the issue of the valuation date of C. & Associates. An evidentiary hearing on the issue was conducted over several days in June 2009, and February, March, and April 2010. On April 23, 2010, the court issued a detailed ruling in which the court found good cause pursuant to Family Code section 2552, subdivision (b) to value C. & Associates as of the date of separation. The court concluded: "[James] presented satisfying evidence and demonstrated 'good cause' to value the business as of the *separation* date. [James] persuaded the court that doing so is the proper (equitable) approach in this case because the value of the business devolves largely from the *personal skill, industry and guidance* of the petitioner/operating spouse as opposed to the

3

underlying capital." The court later denied Christine's request to certify this order for immediate appeal.

Trial commenced in December 2010 and was conducted over several days, concluding in May 2011. The trial court issued a tentative decision and, in January 2012, after receiving posttrial briefing on the issue of attorney fees, issued its statement of decision. The court found the value of C. & Associates was $557,000 on the date of separation. The court rejected Christine's claims that James had violated his fiduciary duties and found he had not misappropriated community property.

On the day after issuing its statement of decision, the trial court issued its ruling on attorney fees. The court (1) confirmed two prior pendente lite attorney fees orders that had required James to advance to Christine a total of $61,000 in attorney fees and $6,000 toward the fees of her forensic accountant and (2) ordered James to pay directly to Christine's counsel the total amount of $100,000 less fees and costs previously paid pursuant to the pendente lite orders. The court otherwise denied Christine's motion to shift attorney fees and costs to James. On its own motion, the court reconsidered appellate attorney fees that the court previously had ordered James to pay to Christine, and directed her appellate counsel to submit declarations and unredacted billing statements for review by the court in camera.

The judgment on reserved issues was entered in May 2012. An addendum to the judgment restated and confirmed the findings made in the statement of decision. Later that month, Christine filed a notice of intention to move for a new trial. In June 2012, she filed a motion to vacate and for a new trial, but later withdrew that motion.

## DISCUSSION

### I.

### Failure to Comply with Appellate Rules

James argues Christine has failed to comply with appellate rules because her opening brief does not present facts favorable to the trial court's ruling and "is written

4

as if James never presented any evidence." He argues we should affirm on that ground alone. Christine responds with a single sentence: "While Respondent's Brief suggests that Appellant has significantly misstated the facts, a careful reading of both briefs and the record indicates that this is not correct."

"An appellant asserting lack of substantial evidence must fairly state all the evidence, not just the evidence favorable to the appellant. [Citation.] '[A]n appellant who challenges a factual determination in the trial court—a jury verdict, or a finding by the judge in a nonjury trial—must marshal *all* of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding.' [Citations.] [¶] If the appellant fails to fairly state all material evidence, we may deem waived any challenge based on insufficiency of the evidence. [Citations.]" (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 415-416; see *Hauselt v. County of Butte* (2009) 172 Cal.App.4th 550, 563 ["plaintiff has forfeited [the substantial evidence] argument because he has cited only the evidence favorable to him"].)

Christine did not fairly state the evidence on the issue of date of valuation of C. & Associates. In challenging the trial court's ruling to value C. & Associates as of the date of separation, Christine ignores the statement of decision and the mountain of evidence supporting it. Instead, she focuses on one fact (the network of outside consultants used by C. & Associates), and mischaracterizes the evidence regarding that fact. On the second issue, whether James breached his fiduciary duties, Christine does provide citations to evidence in the record which, she contends, established a prima facie case of breach. Christine's arguments that the trial court did not apply certain case authority are legal in nature, and she presents the issue of attorney fees as, in effect, a legal matter.

Although we would be justified by invoking waiver against Christine on the issue of date of valuation of C. & Associates, we conclude it would be better to address

that issue on the merits. (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.*, *supra*, 188 Cal.App.4th at p. 416.)

## II.

## The Trial Court Did Not Err by Finding Good Cause to Value C. & Associates as of the Date of Separation.

Christine argues the trial court erred by finding good cause to value C. & Associates as of the date of separation rather than the date of trial. We conclude the trial court did not err.

A. *Relevant Law and Standard of Review*

Family Code section 2552, subdivision (a) states this general rule on date of valuation: "For the purpose of division of the community estate upon dissolution of marriage or legal separation of the parties, except as provided in subdivision (b), the court shall value the assets and liabilities as near as practicable to the time of trial." However, section 2552, subdivision (b) makes the following exception to the general rule: "[T]he court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and before trial to accomplish an equal division of the community estate of the parties in an equitable manner."

"Case law has established that good cause generally exists for a professional practice to be valued as of the date of separation." (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 625 (*Duncan*).) "This exception to trial date valuation applies because the value of such businesses, 'including goodwill, is primarily a reflection of the practitioner's services (accounts receivable and work in progress) and not capital assets such as desks, chairs, law books and computers. Because earnings and accumulations following separation are the spouse's separate property, it follows the community interest should be valued as of the date of separation—the cutoff date for the acquisition of community assets.'" (*Id.* at pp. 625-626, quoting *In re Marriage of Stevenson* (1993) 20 Cal.App.4th 250, 253-254.)

6

The rationale for the general exception to trial date valuation applies equally to any small business that relies on the skill and reputation of the spouse who operates it. (*Duncan*, *supra*, 90 Cal.App.4th at p. 626 [small investment adviser business]; *In re Marriage of Stevenson*, *supra*, 20 Cal.App.4th at p. 254 [small general contracting business.) "Thus, an alternative valuation date may apply to a business when its value 'devolves largely from the personal skill, industry and guidance of the operating spouse,' rather than the business's capital assets." (*Duncan*, *supra*, at p. 626.)

The trial court's determination of the date of valuation is reviewed under the abuse of discretion standard. (*Duncan*, *supra*, 90 Cal.App.4th at p. 625.) Thus, "[a]s long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it." (*Ibid.*)

B. *The Trial Court's Findings*

The trial court made extensive factual findings to support its finding of good cause to value C. & Associates as of the date of separation. The court found, "[C. & Associates] has always operated as a sole proprietorship and provides services at an hourly rate." The court described the business of C. & Associates, as follows: "[C. & Associates] is retained, usually by large insurance companies, to independently review a patient's medical file for reasonable and necessary services and related medical billing. [C. & Associates] also audits for appropriate medical coding and pricing." C. & Associates uses a "network of medical consultants" to conduct such medical reviews, which are incorporated into a written report prepared and signed by James. The consultants "do not manage or operate the business, nor do[es] the number of consultants control or influence business profit or business value." C. & Associates had only four full-time employees, and they worked under the daily direction and control of James.

The court found that C. & Associates "is characterized as having specialized knowledge and experience," that James "is inextricabl[y] intertwined with the daily operations of the business and serves as its key man," and that James "is the person

7

in charge and he makes all the decisions of the business." The court found that James "handles the marketing of the business in search of future business" and "[t]he growth of the business is the direct result of the post separation labor of [James]."

In sum, the court found: "Today, [C. & Associates] is characterized as a small professional practice and its value comprised of mostly goodwill; the intangible assets of the business [are] approximate[ly] 80 - 85% of its net worth; the balance of its value is comprised of capital assets such as furniture, equipment, software and computers. [¶] . . . The value of the business is directly related to the *personal skill, industry and guidance* of its key-man [(James)], the petitioner and operating spouse. [¶] . . . The business is the alter ego of [James]; [¶] . . . The daily operation of the business depends on [James]'s hands-on management and the business has grown due to his personal efforts, skill, labor and reputation."

C. *Substantial Evidence Supported the Trial Court's Findings.*

1. *James's Testimony*

Substantial evidence supported the trial court's findings on the issue of date of valuation for C. & Associates. James testified he formed C. & Associates in 1996, while he was temporarily separated from Christine. C. & Associates is and always has been a sole proprietorship. C. & Associates performs medical review and disability review for health care payers, including insurers and self-insured, ERISA-based plans, to determine the medical necessity of treatments and levels of care. C. & Associates also performs "repricing of hospital bills and outpatient surgery centers, and other services like chemotherapy, emergency room visits, air ambulance, ground ambulance."

James received his M.D. degree from Loyola University School of Medicine in 1980. After serving a one-year internship and two-year residency, James worked two years for the United States Public Health Service, first as a primary care internist and then as the clinical director of a hospital in northern Arizona. Starting in 1985, he worked for Cigna Healthplans of California, first as a medical director trainee

8

and then as associate regional medical director. In 1987, he became vice-president and medical director of Maxicare Health Plans, Inc., which had over 400,000 members. In 1988, James became a corporate medical director for the HMO division of Travelers Health Insurance, HMO, and, after about a year, became the medical director and vice-president of PacifiCare. In 1993, he became a regional vice-president and medical director of Private Healthcare Systems, where he supervised a large group of nurses and physicians in conducting medical necessity reviews.

In 1996, James moved out of the family home and moved into an apartment in which he lived until 2000. In November 1996, while living in this apartment, he formed C. & Associates. In July 1998, James relocated C. & Associates from his apartment to its current 3,600-square-foot office. Between November 1996 and July 1998, Christine did not assist in the operation of C. & Associates. Between July 1998 and May 2004, James saw Christine at C. & Associates' offices one or two times, and never saw her perform job duties at that location.

James explained that when C. & Associates receives a medical file from a client, the file is given to one of two employee medical reviewers who, with James's assistance, decides which specialist would be best to conduct the medical review. C. & Associates employs one nurse and one certified professional coder (CPC), both directly supervised by James, to conduct this level of review.

In 2009, C. & Associates had a network of 250 to 300 doctors and medical professionals who serve as consultants. Every consultant must be licensed and board certified in whichever area the consultant reviews, and must have five years of clinical experience. Consultants cover some 125 specialties and subspecialties, including dentistry. James had recruited over 90 percent of the consultants. He often found consultants, including some in "hard-to-find" specialties, through contacts developed over 25 years.

The consultant conducts a medical review of the file, prepares a report, and sends it to C. & Associates.  The report is converted into a Word document, after which it is reviewed first by C. & Associates' medical review staff and then by James.  The consultant does not sign the report and the consultant's name is rarely divulged to the client.  James reviews and signs every report, often adding comments.

Consultants earn from $1,500 to $15,000 per year.  In 2004, consultants were billed to clients at the rate of $220 per hour.  In 2009, their billing rate was $260 per hour, except for one consultant, whose billing rate was $240 per hour.  James pays the consultants about one-half the billing rate.  James monitors the fees paid to the consultants.

About one-third of C. & Associates' business is "repricing" which is handled internally.

In May 2004, C. & Associates had about 38 clients and gross revenues of about $1 million for the prior 12 months.  In June 2009, C. & Associates had about 69 clients and gross revenues of about $1.6 million for the prior 12 months.  James worked about 40 hours per week in 2004 and about 60 hours per week in the 12 months preceding June 2009.  He has a secure home office and, even while on vacation, communicates with C. & Associates 10 to 15 times a day.  James reviews and prepares final bills to clients.

As of February 2010, C. & Associates had six employees:  a medical nurse reviewer, a CPC medical reviewer, three "front office" assistants, and a sales and marketing associate.  C. & Associates also hired an offsite bookkeeper as an independent consultant.  In May 2004, C. & Associates did not employ any medical reviewers; James first hired a medical nurse reviewer and a CPC reviewer after the date of separation.  In May 2004, C. & Associates employed only one front office assistant and did not employ a sales and marketing associate.

10

In April 2006, after the date of separation, C. & Associates received accreditation from the Utilization Review Accreditation Commission (URAC), a private nonprofit organization that accredits medical review companies. The accreditation was renewed in 2009. James described URAC accreditation as "essential to remain competitive" and began the process of obtaining URAC accreditation in 2005. To obtain accreditation for C. & Associates, James had to modify office procedures and policies, and had to create an executive committee and a quality management committee. James is a member of both committees and participates in their meetings. He also is responsible for compliance with the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.).

C. & Associates solicits customers by exhibiting at trade shows, mailings, and "cold call[s]" to potential customers. At trade shows, James sets up a booth, operates the booth during exhibit hours, and attends conference sessions to meet potential customers informally. About 50 or 60 percent of the time, he brings someone to assist him at trade shows. James does about 95 percent of the cold calls to potential customers, and potential clients who respond to mailings speak with him. For six months in 2008, C. & Associates had employed a sales representative, but he did not bring in enough business to justify his salary and was laid off.

2. *Mehner's Testimony*

Mehner, James's accounting expert, offered these opinions:

1. The value of C. & Associates was $557,000 as of the date of separation, May 6, 2004. Of that amount, tangible assets (fixed assets, accounts receivable, and cash) were about 15 percent, and the rest was goodwill.

2. The valuation of C. & Associates as of the date of separation was appropriate because "it was a sole proprietorship that had essentially four employees at the time that were not highly compensated. So in my review of this, it appeared that [James] was the driving force behind this business and the one [who] would either make

11

it go up or go down."  Mehner's opinion would be the same if he were valuing C. & Associates as of the date he testified.

3.  James was "essentially the business, running it on a day-to-day basis" and his "individual efforts are what make this business increase or decrease in value." James's reputation and work efforts were "critical" to the success of C. & Associates.

4.  C. & Associates' network of consultants had "no influence" on business valuation because they did not run the business but were "relatively, on an individual basis, a minor contributor."  The consultants were "a tool" that James used to perform medical reviews.  They were replaceable and not key to the success of the business.

5.  C. & Associates was a professional practice, which Mehner defined as "a practice that performs services for a fee that has a specialized technical knowledge and experience, usually requires a license to practice and usually is a practice that does not consist of a lot of capital."

D.  *The* Duncan *Case*

The evidence thus established that C. & Associates is a professional practice, the value of which is primarily a reflection of James's skill, reputation, guidance, and efforts, rather than its capital assets.  Goodwill accounted for 85 percent of the value of the business.  James was primarily responsible for every aspect of the operation of C. & Associates, including business development, accreditation, recruiting the network of consultants, and reviewing and signing every medical review report.  A fair inference from the evidence is that the growth of C. & Associates from the date of separation to the date of trial was due primarily to the reputation, skill, and efforts of James.

*Duncan*, *supra*, 90 Cal.App.4th 617, supports the decision to value C. & Associates as of the date of separation.  In that case, the husband operated an investment advisory business that at the time of separation managed $1.086 billion in assets and had 19 employees, including investment analysts, traders, and marketing specialists.  (*Id*. at

12

p. 623.)  At the time of separation, the husband was earning $5.8 million per year.  (*Ibid.*)  Two years later, the business managed $2.628 billion in assets.  (*Ibid.*)  The husband made investment decisions for at least 97 percent of those assets.  (*Ibid.*)  Affirming the trial court's decision to value the business as of the date of separation, the Court of Appeal concluded the business was a professional practice, the success of which was due almost exclusively to the husband's reputation, skill, industry, and guidance.  (*Id.* at pp. 626-627.)  The court rejected the wife's argument that the increase in value of the business after the date of separation was due to contractual fees that clients paid regardless of the husband's efforts, the growth in funds under management, and a "flourishing stock market."  (*Id.* at pp. 627-628.)  The husband's skill and reputation were crucial to obtaining and retaining clients, and to making investment decisions resulting in the growth in funds under management.  (*Id.* at p. 628.)  Further, the court concluded, "[n]othing in [Family Code] section 2552, subdivision (b), case law or logic requires the court to find the *entire* postseparation change in value was due *exclusively* to the personal efforts of the operating spouse in order to apply an alternative valuation date."  (*Id.* at p. 627.)

Christine contends *Duncan* is distinguishable on the ground C. & Associates "is not a small business" because it has "250 to 300 highly skilled doctors who work as consultants and who play a very critical role in the Business."  She concedes it is appropriate to use the date of separation for valuation of a small business that is operated exclusively by one spouse and that is largely dependent for its success on the operating spouse's skill, reputation, and industry.  She argues, however, C. & Associates does not meet those criteria because it has "300 to 400 doctors" working for it.

Christine grossly mischaracterizes the evidence and ignores the standard of review.  The evidence established C. & Associates' consultants were not employees, but independent contractors who were paid on average $1,288 per year in 2009.  Mehner testified the consultant network was not key to the success of C. & Associates and,

13

individually, the consultants "have absolutely no impact on the direction of this business." Certainly, the network of consultants contributed to the success of C. & Associates, but, as the *Duncan* court concluded, it is not necessary for the entire postseparation change in value to be due exclusively to the operating spouse's personal efforts for the alternative valuation date to apply. Moreover, James personally recruited over 90 percent of the medical specialists comprising the network of consultants.

## III.

### Christine Failed to Present Prima Facie Evidence That James Misappropriated Community Assets.

Christine argues the trial court abused its discretion by "refusing to find" (capitalization & underscoring omitted) that James breached any fiduciary duties imposed by Family Code section 721. In related arguments, Christine contends the trial court erred by concluding *Margulis*, *supra*, 198 Cal.App.4th 1252, 1269, was inapplicable to this case and erred by "refusing to apply" (capitalization & underscoring omitted) the holding in *Haines*, *supra*, 33 Cal.App.4th 277.

A. *Relevant Law*

Family Code section 721, subdivision (b) provides in part: "Except as provided in Sections 143, 144, 146, 16040, and 16047 of the Probate Code, in transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code."

14

"[Family Code s]ection 721, subdivision (b)'s specific incorporation of 'the same rights and duties of nonmarital business partners, as provided in' section 16403 of the Corporations Code, makes clear that the duty to disclose relevant information concerning transactions affecting the community property is an affirmative and broad obligation." (*Margulis*, *supra*, 198 Cal.App.4th at p. 1269.) In *Margulis*, the court answered in the affirmative to this question: "In a marital dissolution proceeding to divide the community property, where the nonmanaging spouse offers prima facie evidence that community assets of a certain value have disappeared while in the control of the managing spouse postseparation, should the managing spouse have the burden of proof to account for the missing assets?" (*Id.* at p. 1257, fn. omitted.)

James argues *Margulis* concerned postseparation assets, and therefore does not apply to this case, which concerns preseparation assets. We will assume *Margulis* does apply to both postseparation and preseparation assets. The trial court found that Christine did not offer prima facie evidence that James misappropriated community assets or breached any fiduciary duties and, as a consequence, the burden of proof never shifted to him. The trial court did not err by so finding.

B. *The Trial Court's Findings*

In the statement of decision, the trial court found:

1. "Christine failed to prove James misappropriated community funds or in any other way violated his fiduciary duty insofar as refinancing of the family residence. [¶] . . . At trial, there was a dearth of evidence that between 1991 and 1999, James dominated or solely controlled the management of the household affairs to the exclusion of Christine."

2. "Christine failed to present a prima facie showing that before or after [the date of separation], James engaged in any act of misappropriation of community property or engaged in any act or pattern of predicate conduct supporting any breach of fiduciary duty and misappropriation of funds, either from C[.] and Associates or from the

15

serial refinance of the former family residence. [¶] . . . The case of IRMO Margulies [*sic*] . . . is distinguishable both as to its facts and the holding."

3. "On the other hand, while the burden of proof never shifted to James, nonetheless James provided credible and satisfying evidence explaining the use of funds following the refinancing [of] 17 Stillwater. [¶] . . . Finding: Christine failed to prove James breached his fiduciary duty owed to the community."

In an addendum to the judgment on reserved issues, the trial court found: "[Christine] failed to present a prima facie showing that before or after the date of separation [James] engaged in any active misappropriation of community property or engaged in any act o[r] pattern o[f] predicate conduct supporting any breach of fiduciary duty and misappropriation of funds either from the business known as C[.] & Associates or from the serial refinance of the former family residence."

C. *Christine's Specific Contentions*

Christine contends that James breached his fiduciary duties to her by misappropriating (1) $160,000 in proceeds from the sale of Christine's separate property home; (2) $469,000 in proceeds from serial refinances of the family residence at 17 Stillwater, Irvine (the Stillwater Home); (3) $1.5 million to $2 million in profits from C. & Associates from 1999 through 2004; (4) $1.3 million in profits from the sale of shares in EXTEN; and (5) $168,000 in bank deposits. Number (5) was not raised at trial, and, therefore, we deem the contention forfeited.[2] (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

With regard to numbers (1) through (4), we address whether Christine presented prima facie evidence that James misappropriated community property. Prima

_____

[2] James argues three of the five claims were not raised at trial. Christine's trial brief expressly raised numbers (1), (2), and (3). Christine's trial brief indirectly raised number (4) by asserting James took funds "well in excess of two million dollars" from "the family business, stock accounts and community investments."

16

facie evidence is "'[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.'" (*People v. Skiles* (2011) 51 Cal.4th 1178, 1186.) In determining whether Christine presented prima face evidence, we rely exclusively on the record citations provided by Christine, as it is not our duty to search the record to find error. (*People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 502.)

### 1. *$160,000 in Proceeds from the Sale of Christine's Separate Property Home*

Christine contends, "James sold [my] separate property house in 1989 and received a profit of circa $160,000 from the sale" and "never accounted for what happened to the profits." At trial, she presented no competent evidence in support of that claim. The only evidence cited in Christine's appellate briefs is the testimony of her forensic accountant at page 787 of the reporter's transcript. There, the accountant testified only that Christine had told him that James had sold her home from before the marriage and had failed to account for $160,000 of the sale proceeds. The accountant testified he had not been given any documents to support this claim.

In addition, the closing statement from the sale of Christine's home was received in evidence at trial. The closing statement identified a sale price of $326,000 and a first deed of trust in the amount of nearly $230,000. The closing statement fully accounted for the difference.[3]

### 2. *$469,000 in Proceeds from Serial Refinances of the Stillwater Home*

Christine contends there were $469,000 in proceeds from refinancing the Stillwater Home, and she "never knew about this until she received court papers in 2005 shortly before her first trial." Christine claimed there had been $418,000 in refinancing proceeds.

---

[3] We granted James's application under rule 8.224(c) of the California Rules of Court for late transmittal of trial exhibit JJ, the seller's closing statement.

In support of the contention that James misappropriated refinancing proceeds, Christine cites to pages 782-788, 1297-1330, and 1374 of the reporter's transcript and trial exhibit F. None of this evidence supports a prima facie case that James misappropriated any proceeds from the refinancing of the Stillwater Home. At pages 782-788 of the reporter's transcript, Christine's expert accountant testified he was given a schedule of the refinances of the Stillwater Home with supporting documents, such as deeds of trust and quitclaim deeds. The accountant testified the total amount on the schedule was $418,800. He did not testify on the issue whether James misappropriated any of those proceeds, but testified he conducted no independent investigation and did not know where the proceeds went.

At pages 1297-1330 of the reporter's transcript, James testified about the disposition of the refinance proceeds. He carefully explained that refinance proceeds were used to pay loans and community credit card debt and to make improvements to the Stillwater Home. At page 1374 of the reporter's transcript, Christine testified she did not know "how much money Dr. C[.] was taking on the refinancing of the property." Trial exhibit F was described as the "real estate transfer documents," although the trial court cautioned its "characterization as to trial exhibit F is not particularly accurate" and "characterization of any trial exhibit is not legally significant." Christine did not include any trial exhibits in the appellant's appendix or otherwise submit them to us. (See Cal. Rules of Court, rules 8.122(b)(3)(B), 8.124(b)(1)(B), 8.224(a) & (b).) We therefore cannot consider trial exhibit F.

3. *$1.5 Million to $2 Million in Profits from C. & Associates from 1999 Through 2004*

Christine contends that "James had siphoned off circa $1,500,000 to $2,000,000 from [C. & Associates] between 1999 and 2004" and she "never knew about these profits until circa 2005." In support of the contention that James "siphoned off"

18

money from C. & Associates, Christine cites to pages 1182-1992 of the reporter's transcript, pages 1503 and 1800-1809 of the appellant's appendix, and trial exhibit FF.

At pages 1182-1191 of the reporter's transcript is the testimony of Christine's friend, Daniel Remy, who prepared a one-page report concluding that James had not accounted for $1,942,087 from 2000 through 2004. As James asserts, Remy came up with that number using questionable techniques. Remy added depreciation back into schedule C of James's income tax return for 2004 and assumed James's expenses in 2001, 2002, and 2003, were the same as in 2004 without looking at documentation. Remy deducted federal income taxes from James's income, but did not deduct state taxes. In its January 2012 attorney fees order, the trial court noted that Remy "was at-a-glance, not competent to offer any forensic accounting of funds." The trial court is the sole judge of witness credibility, and we have no reason to dispute its assessment of Remy. We agree with James that Remy's testimony had no foundation, was "demonstrably incorrect," and did not support a prima facie claim.

At pages 1800-1809 of the appellant's appendix is a declaration of Remy from October 2011, long after trial had concluded. Trial exhibit FF is Remy's one-page report. As Christine has not supplied us the trial exhibits, we cannot consider exhibit FF.

4. *$1.3 Million in Profits from the Sale of Shares of EXTEN*

Christine contends that "James, while he was married between 1999 and 2004 made an undisclosed profit of $1,300,000 from the sale of EXTEN stock" and she "did not discover this until 2011." She asserts she first learned of this "undisclosed profit" in a declaration filed with the court after trial but before the judgment. The declaration to which she refers is Remy's declaration, filed in October 2011. Christine does not cite to any evidence presented at trial to support her contention that James made an undisclosed profit from the sale of EXTEN shares. In June 2012, Christine filed a motion to vacate and for a new trial on the ground, among others, of newly found

19

evidence allegedly revealing this undisclosed profit. She later withdrew the motion and never moved for a new trial.

Thus, Christine failed to present prima facie evidence that James misappropriated community property either before or after the date of separation. *Margulis* holds the managing spouse has the burden of proof to account for the missing assets when the nonmanaging spouse offers prima facie evidence that community assets of a certain value have disappeared while in the control of the managing spouse postseparation. (*Margulis*, *supra*, 198 Cal.App.4th at pp. 1257-1258.) Since Christine failed to present such prima facie evidence, the trial court correctly concluded *Margulis* was distinguishable on its facts and did not apply to this case.

D. *The* Haines *Case*

Christine argues the trial court erred by "refusing to apply" (capitalization & underscoring omitted) the holding in *Haines*, *supra*, 33 Cal.App.4th 277. In *Haines*, the Court of Appeal held that when one spouse takes undue advantage of another in an interspousal transaction, a presumption of undue influence arises, and that presumption prevails over the common law presumption in favor of title, as codified in Evidence Code section 662. (*Haines*, *supra*, at pp. 282, 301.)

It is difficult to see how the trial court could have *refused* to apply *Haines*, given, as James points out, Christine never cited that case or any of its progeny to the trial court. Christine never argued a presumption of undue influence arose, nor did she seek any result afforded by *Haines*. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

In any event, the trial court's decision is consistent with *Haines*. In her appellate briefs, Christine claims that James took undue advantage of her by (1) misappropriating the sale proceeds from her separate property home, (2) having her quitclaim her interest in the Stillwater Home to James in 1992 without compensation, and

20

(3) taking $469,000 in refinancing proceeds from the Stillwater Home without her knowledge.

Christine failed to present evidence that James took undue advantage of her in any of those transactions. As to the first transaction, we concluded above that Christine failed to present prima facie evidence that James misappropriated any proceeds from the sale of her home.

As to the second transaction, in May 1992, Christine quitclaimed her interest in the Stillwater Home to James. In May 1999, James conveyed the Stillwater Home to Christine and himself as community property. At that time, the loan secured by the Stillwater Home had a balance of $424,923.42. Christine argues the trial court should have declared the May 1992 quitclaim deed invalid and declared the refinancing proceeds received between May 1992 and May 1999 to be community property. However, Christine never asked the trial court to invalidate the May 1992 quitclaim deed. Her appellate briefs supply no record references to support her contention that James deceived her into signing the May 1992 quitclaim deed by telling her it was necessary to receive a better refinance rate.

As to the third transaction, we explained above that Christine presented no prima facie evidence that James misappropriated any of the refinancing proceeds, and James testified the proceeds were used to pay credit card debt and make improvements to the Stillwater Home. Because Christine did not present, and does not cite to, evidence that James took undue advantage of her in an interspousal transaction, a presumption of undue influence under *Haines* never arose.

## IV.

### The Trial Court Did Not Err in Its Attorney-fee-shifting Orders.

The trial court ultimately ordered James to pay Christine's trial counsel a total of $100,000 in attorney fees and costs and to pay $6,000 "toward her forensic

expert." Christine had requested a total of $321,432 in fees for trial counsel and $19,127 in costs. The trial court, on its own motion, reduced Christine's award of appellate attorney fees and costs from $97,000 to $67,000. Christine argues the trial court abused its discretion by not awarding her a larger amount of attorney fees. We disagree. The trial court made extensive findings on those factors, and those findings amply support the trial court's fair and sensible decision.

A. *Relevant Law and Standard of Review*

Family Code section 2030, subdivision (a)(1) provides that in a marital dissolution proceeding, the court "shall ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding."

Family Code section 2032, subdivision (a) provides: "The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties."

Family Code section 2032, subdivision (b) provides: "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. *Financial resources are only one factor for the court to consider in*

22

*determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances.*"  (Italics added.)

The other factors for the court to consider in apportioning the overall cost of litigation include ""the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, [the attorney's] learning, [the attorney's] age, and [the attorney's] experience in the particular type of work demanded [citation]; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed.  [Citations.]"  [Citations.]'  [Citation.]"  (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 870.)

"'A motion for attorney fees and costs in a dissolution action is addressed to the sound discretion of the trial court, and in the absence of a clear showing of abuse, its determination will not be disturbed on appeal.  [Citations.]  The discretion invoked is that of the trial court, not the reviewing court, and the trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made.  [Citations.]'"  (*In re Marriage of Keech*, *supra*, 75 Cal.App.4th at p. 866.)  The record, including the attorney fees order, must reflect the trial court actually exercised its discretion and considered the statutory factors in the exercise of that discretion.  (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 254.)

B.  *Christine's Challenge to the Attorney Fees Orders*

In January 2012, the trial court issued an order on Christine's posttrial motion for attorney fees.  Christine had requested the court to order James to pay her trial attorney $321,432 in fees and $19,127 in costs.  Of those amounts, the trial court ordered James to pay $100,000 in attorney fees and costs, less fees and costs paid toward the pendente lite awards.  In the same order, the court, on its own motion, decided to reconsider its previous order that James pay $97,000 toward Christine's appellate

23

attorney fees and costs. In May 2012, after reviewing in camera unredacted billing statements and declarations for Christine's appellate counsel, the trial court reduced the award of appellate attorney fees and costs to the amount of $67,000.

Christine challenges the trial court's attorney-fee-shifting orders on one ground only: She argues James is far wealthier than she is and, "[g]iven this disproportionality in the circumstances of James and Christine, it is clear that the trial court abused its discretion by not awarding Christine a much larger award for attorney fees and for forensic accounting fees."

Christine's argument fails as a matter of law. As stated in Family Code section 2032, subdivision (b) itself, financial resources are only one factor for the trial court to consider in making an attorney fees award. "[T]he purpose of [Family Code] section 2030 is *not* the redistribution of money from the greater income party to the lesser income party." (*Alan S. v. Superior Court*, *supra*, 172 Cal.App.4th at p. 251.) The determination of an attorney fees award "should be the product of a nuanced process in which the trial court should try to get the 'big picture' of the case, i.e., 'the relative circumstances of the respective parties' as the statute puts it." (*Id.* at p. 254.)

Here, the trial court took that nuanced approach and properly considered all the relevant factors, not just financial resources, in making its attorney fees orders. The court's January 2012 order includes an 18-page attachment with extensive findings supporting the court's decision. Among other things, the trial court found (1) Christine's attorney fees were grossly disproportional to the issues raised and the complexity of the case; (2) Christine has had the ability to retain counsel of her choice and fairly present her case; (3) Christine "over litigated" (boldface omitted) the case; (4) throughout retrial, Christine took extreme and unreasonable positions; (5) the case was not complex; (6) Christine's trial counsel billed for unnecessary tasks and overbilled; (7) Christine "was not truthful" at trial; and (8) Christine and her friend, Remy, were "difficult to manage," and "were responsible for the enormity of Christine's legal expenses," and their

24

conduct and tactics "dr[ove] skyward the attorney fees and costs incurred by James." Christine ignores these findings wholesale.

The trial court has a duty to consider whether attorney fees incurred were reasonably necessary to maintain or defend the action. (*Alan S. v. Superior Court*, *supra*, 172 Cal.App.4th at p. 255.) In compliance with that duty, the trial court in this case carefully scrutinized Christine's legal fees and agreed with the billing survey conducted by an attorney fees auditor who concluded that Christine's trial counsel performed unnecessary work and overbilled. Christine does not address this point.

The trial court also made findings to support its order reducing the amount of appellate attorney fees and costs awarded Christine. After filing her opening brief in *C. I*, Christine retained new appellate counsel, who charged a total of $57,000. Of that amount, $30,920 was for analyzing the opening brief and reviewing the record on appeal. The trial court found that "[James] should not have to pay for the work performed by [the successor appellate counsel] for these services" and reduced the fees by $20,000. The court also found that Christine had the ability to pay $10,000 of her appellate attorney fees. Christine does not challenge these findings.

In conclusion, the trial court considered the proper factors and made all necessary findings in making its attorney fees orders. Christine has failed to show the court abused its discretion.

## MOTION FOR SANCTIONS FOR FRIVOLOUS APPEAL

James has brought a motion under California Rules of Court, rule 8.276(a)(1) for an order imposing sanctions against Christine and her appellate counsel for pursuing a frivolous appeal. He requests sanctions in the amount of $39,681.98 to compensate him for attorney fees and costs, and asks that we consider imposing additional punitive sanctions. Christine filed opposition to the motion.

25

Code of Civil Procedure section 907 provides: "When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just." The Court of Appeal may impose sanctions for "[t]aking a frivolous appeal or appealing solely to cause delay." (Cal. Rules of Court, rule 8.276(a)(1).) An appeal is frivolous when (1) "it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment" or (2) "it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) The first standard—improper motive—is tested subjectively, while the second standard—indisputably without merit—is tested objectively. (*In re Marriage of Gong & Kwong* (2008) 163 Cal.App.4th 510, 516.)

James argues Christine's appeal falls under the second standard, that is, "[t]his appeal is indisputably without merit." He argues: "As noted in the Respondent's brief, [Christine] relies on claims, allegations, and facts outside the record and posits her version of the facts as true. Although [James] set forth the correct standard of review and multiple arguments in his Respondent's Brief as to why the trial court's order must be affirmed, those arguments go largely ignored in Christine's Reply Brief, which just repeats the claims of the Opening Brief with no additional analysis. Looking at the several issues presented, each is frivolous."

We have seriously considered imposing sanctions. In her appellate briefs, Christine virtually ignores the trial court's findings and the evidence supporting those findings. However, at oral argument, Christine's appellate counsel explained the state of the record and the amount of time necessary for him to prepare and review it. Counsel apologized to the court and accepted responsibility for inadequacies in the Christine's appellate briefs. Sanctions should be used sparingly to deter only the most egregious conduct (*In re Marriage of Flaherty*, *supra*, 31 Cal.3d at pp. 650-651), and, ultimately, we do not find them warranted here.

26

## DISPOSITION

The judgment is affirmed.  Respondent to recover costs on appeal.


FYBEL, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

RYLAARSDAM, ACTING P. J. Concurring:

I concur in the decision to affirm the judgment and to order appellant to bear the costs of the appeal.  But Christine's appellate briefs are so inadequate and the grounds for the appeal so frivolous that I deem it appropriate to sanction her.  In my opinion she should at least reimburse James for the attorney fees he incurred in responding to her appeal.

RYLAARSDAM, ACTING P. J.

1