Filed 5/28/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re the Marriage of LALEH TAGHVAEI MOHAMMADIJOO and RAMIN DADASHIAN. | |
| LALEH TAGHVAEI MOHAMMADIJOO, Plaintiff and Respondent, v. RAMIN DADASHIAN, Defendant and Appellant. | A163185 (Contra Costa County Super. Ct. No. D1304989) |

Ramin Dadashian appeals from a judgment of dissolution entered after a lengthy bench trial on reserved issues in divorce proceedings with his former wife, Laleh Mohammadijoo.

His principal contention is that the trial court erred by not shifting the burden of proof to his former wife under *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252 (*Margulis*) to prove the disposition and valuation of two missing assets over which he contends she had exclusive management and control postseparation, through her brother in Iran: (1) approximately $150,000 in community funds his former wife secured through a home equity line of credit (HELOC) and transferred to Iran for her brother to manage, and (2) approximately $170,000 of separate property proceeds he

1

inherited from his father's real estate investments in Iran that she encouraged him to also place under her brother's management and control in Iran. Neither of the assets were accounted for at the time of trial, and the trial court declined to charge his former wife with the value of the missing assets. It did, though, sanction her for violating her statutory disclosure obligations.

We agree with appellant and reverse the judgment. We hold that the *Margulis* burden-shifting framework applies when one spouse solely controls and manages a relationship with a third party who directly oversees the management and investment of community funds postseparation. In such a case, the managing spouse must account for the missing assets under the *Margulis* burden-shifting framework. Accordingly, we conclude the trial court erred in declining to shift the burden under *Margulis* concerning the HELOC funds.

We also hold that the *Margulis* burden-shifting framework extends to missing separate property, such that a person who has been entrusted with the control and management of their spouse's separate property during marriage must account for its disposition and valuation post-separation according to the same burden-shifting principles. Accordingly, the trial court also erred in declining to shift the burden of proof to appellant's former wife regarding appellant's allegedly missing inheritance proceeds.

## BACKGROUND

### I.

*Margulis* addresses how to allocate and account for the disposition of assets that are missing from the community estate at the time of property division, when one spouse solely controlled and managed the asset after the parties separated. It holds that "where the nonmanaging spouse offers prima

2

facie evidence that community assets of a certain value have disappeared while in the control of the managing spouse postseparation," the managing spouse has the burden of proof to account for the missing assets. (*Margulis, supra,* 198 Cal.App.4th at p. 1257.)

Under the *Margulis* burden-shifting framework, "once a nonmanaging spouse makes a prima facie showing concerning the existence and value of community assets in the control of the other spouse postseparation, the burden of proof shifts to the managing spouse to rebut the showing or prove the proper disposition or lesser value of these assets. If the managing spouse fails to meet this burden, the court should charge the managing spouse with the assets according to the prima facie showing."[1] (*Margulis, supra,* 198 Cal.App.4th at p. 1267.)

*Margulis* derived this rule from both general legal principles and inter-spousal duties that attach during marriage and continue after separation. Specifically, the court relied upon principles governing the re-allocation of burden of proof when one party has unequal access to evidence, which it said, "are particularly pressing in the context of a marital dissolution where financial records can be crucial to ensuring the equal division of property." (*Margulis, supra,* 198 Cal.App.4th at pp. 1267-1268.) It also extensively discussed and relied on fiduciary duties of disclosure and accounting under numerous provisions of the Family Code including sections 721, 1100, 1101 and 2100. (*Margulis,* at pp. 1269-1270.) On latter point, *Margulis* explained:

---

[1] The managing spouse's evidentiary burden does not require a " 'detailed' accounting" but merely proof by "competent evidence" that the asset in his or her control has been managed in a manner consistent with a spouse's fiduciary obligations, a showing that may take into account "the length of the separation and the attendant difficulties of proof." (*Margulis, supra,* 198 Cal.App.4th at p. 1279.)

3

"Taken together, these Family Code provisions impose on a managing spouse affirmative, wide-ranging duties to disclose and account for the *existence, valuation,* and *disposition* of all community assets from the date of separation through final property division.  These statutes obligate a managing spouse to disclose soon after separation all the property that belongs or might belong to the community, and its value, and then to account for the management of that property, revealing any material changes in the community estate, such as the transfer or loss of assets.  This strict transparency both discourages unfair dealing and empowers the nonmanaging spouse to remedy any breach of fiduciary duty" by the managing spouse.  (*Id.* at pp. 1270-1271.)

*Margulis* ordered a retrial of community property issues where the trial court failed to shift the burden of proof to the managing spouse.  In that case, a husband solely controlled and managed the couple's finances, and the wife introduced a financial statement prepared three years after separation reflecting that they had community property brokerage accounts holding $1.3 million.  (See *Margulis*, *supra*, 198 Cal.App.4th at pp. 1257, 1262.)  Nine years after the financial statement was prepared, the case went to trial and the husband argued the money was gone (due to market declines and legitimate expenditures) yet failed to *prove* what happened to the assets.  (*Id.* at pp. 1257, 1260-1261.)  The trial court declined to charge husband with the value of the missing assets (*id.* at p. 1257), and the Court of Appeal reversed. It held that a complete retrial of the community property issues was warranted due to the trial court's erroneous placement of the burden of proof on wife rather than husband to account for the missing assets.  (*Id.* at p. 1280.)

## II.

The parties, who had an arranged marriage, are Iranian immigrants. They married in Iran while Laleh was still residing there (in June 2001), and then settled in California where they raised a family. They separated approximately 12 years later, in October 2013.

According to the trial court's findings, Laleh grew up in an affluent family in Iran and was accustomed to a high standard of living. Ramin misled her about his wealth and the lifestyle she would enjoy if she married him and moved to the U.S., which made her bitter. According to the trial court, "a continuing theme in the household was [her] disappointment in the wealth and earnings" of her husband. During the marriage, the couple was living well above their means, through large cash infusions from Iran. Also, Ramin was very controlling regarding money. Laleh often encouraged him to make investments to improve their financial situation, and the trial court found they were both willing to make risky investments to yield high returns, including by sending funds to Iran for investment.

Both during the marriage and after separation, Laleh transferred money to and from Iran through a method called "Havaleh," an informal network of individuals who cooperated in transferring or receiving money to and from Iran as intermediaries without direct wire transfers, to evade international sanctions.

Laleh relied on her brother, Ali, who was a successful businessman in Iran, to conduct her financial affairs in Iran. The two spoke almost daily. Laleh testified that when she got married, she had given her brother a full power of attorney to do "anything" to act on her behalf in Iran. She trusted him "110 percent" and he would do anything she asked of him.

5

She testified that during the marriage, Ali opened a joint bank account for the couple in Iran to facilitate their investments there. She also testified her brother probably showed her banking statements for the account while she was in Iran, or a checkbook for the account, listing its deposits.

In June 2007, while in Iran, Ramin signed a general power of attorney for Ali at Laleh's request, to manage their Iranian joint bank account and real estate investments.[2]

Ramin testified Laleh told him she trusted her brother and so "we asked him to do everything." He also testified Laleh and her brother spoke almost daily, they managed the couple's investments in Iran and "I was told upfront hands off."

In 2007, while in Iran, Ramin received proceeds from the sale of real estate he inherited from his father and at trial he testified he gave Laleh a check for the proceeds to deposit into their Iranian bank account. The parties agree that the inheritance was around $170,000. Ramin testified the two had agreed to use his inheritance to buy real estate in Iran, and that Laleh told him that this was what happened with the money. He testified they chose to buy a high-end apartment complex in Tehran for about $350,000, she told him they did so, and told him they took the property in their joint names.[3] Ramin also testified Laleh eventually told him their investment had been profitable enough to fund the purchase of a second rental property in Iran,

---

[2] Once they separated, Ramin worked to revoke the power of attorney which was accomplished in December 2014.

[3] Although the source of the balance of the purchase price, over and above Ramin's $170,000 inheritance, is unclear from the parties' briefs, Ramin testified the couple's Iranian real estate holdings also were funded from the HELOC proceeds.

6

and that "I think she had her brother do everything" in connection with that transaction including finding the second property to buy. His account was corroborated generally by a friend of Laleh's of nearly 20 years, who testified about conversations she had with Laleh about Laleh's financial complaints, the disposition of Ramin's inheritance proceeds and the couple's Iranian real estate holdings. At trial, Laleh acknowledged she "might have been" in Iran when Ramin sold the inherited properties and that she wanted him to invest the proceeds in Iranian real estate. But she denied receiving a check for the inheritance proceeds from Ramin, claimed she did not know what happened to the inheritance money and gave evasive answers when questioned. According to the trial court's statement of decision, "[t]here is no credible and convincing evidence as to what exactly happened to the inheritance after 2007 or 2008." The trial court also made a finding Laleh had no "plan" to steal Ramin's inheritance.

In 2008, the couple withdrew between $130,000 and $150,000 from a HELOC and sent the funds to Laleh's brother in Iran. Laleh signed the paperwork to do this, and the parties disputed whether it was done with Ramin's knowledge.[4] The trial court resolved the dispute in Laleh's favor, finding that "[t]he HELOC loan proceeds were sent to Iran for investment with the knowledge of both parties." It made no findings concerning the ultimate disposition of the HELOC proceeds, however, ruling that "[t]here is

---

[4] The lender, Wells Fargo, ultimately forgave the indebtedness three years later, in 2010. Ramin had attempted to renegotiate the debt so they could afford the monthly payments and had also suggested to Laleh they repatriate money from Iran to pay it off, but she resisted and would not consent.

7

no credible evidence as to what happened to the funds in the [Iranian] bank account after 2007 or 2008."

As noted, the parties separated in October 2013. When Laleh left their marital residence in a few months later (in February 2014), Ramin discovered that the file folder containing all of the records of their Iranian investments was missing. Around the time they separated, he asked Laleh what happened to the Iranian assets and she told him, " 'Do not ask about the money. There's no more money in Iran.' "

He then undertook efforts to obtain information about the Iranian assets that he testified were "extremely painful and time-consuming." He hired a lawyer, reached out to an uncle in Iran who was able to provide him with a single bank statement; and engaged a company in California that assists Iranian expatriates to handle their affairs in Iran. The parties do not specify precisely what information those efforts yielded, but presumably it was minimal. As noted, the trial court found there was "no credible evidence" as to what happened to the funds.

Laleh's pretrial litigation posture was unhelpful and uninformative. In discovery responses, she denied knowing anything about Ramin's inheritance or the HELOC funds. In deposition, she avoided answering any questions about it. Time and again, both in deposition and later at trial, she just continually insisted Ramin owed "a lot of money" to a lot of people in Iran, and owed *her* $1.5 million. Without any notice to Ramin, she also obtained a $1.5 million judgment against him in Iran for the dowry she claimed he owed her, which prevented him from traveling there anymore because he would be arrested.

In addition, the trial court found Laleh treated her pretrial financial disclosures "casually."

In February 2014, several months after the parties separated, Laleh served a preliminary disclosure of assets (identified at trial as Exhibit FFF). Among other information, it identified two houses in Iran purchased during the marriage (qualified by the caveat, "[p]er H.'s [d]iscl[osure]") both of which were stated to be of "[u]nknown" current value. It also listed $150,000 in funds from the HELOC that were "placed into interest bearing [account in] Iran" that was stated to be of "[u]nknown" present value, and $91,000 in "[r]ent from [h]ouse in Tehran, Iran" (also qualified by the caveat, "[p]er H.'s [d]iscl[osure]"). Later in deposition, however, Laleh testified the signature on this document was not hers, and at trial she testified the document was inaccurate because there were no real estate holdings in Iran.

In December 2014, Laleh disclosed the same information in another schedule of assets (identified at trial as Trial Exhibit GGG). She also incorporated the entire December 2014 financial disclosure into answers to interrogatories prepared the same date. At trial, however, she again testified that the signature on each of the two documents was not hers and that the information about the property in Iran was not accurate.

Her attorney prepared a third schedule of assets on March 1, 2019 (identified at trial as Trial Exhibit ZZZ), that Laleh testified was accurate. Laleh testified she couldn't remember signing it but acknowledged discussing it with her attorney and providing information to her attorney to fill it out. It listed none of the Iranian assets previously disclosed.[5]

The case proceeded to a 17-day bench trial, beginning on March 4, 2019, and ending more than a year later on July 23, 2020.

---

[5] It is unclear from the record whether that exhibit was admitted into evidence, but neither party discusses nor relies upon its contents for any purpose.

During trial, Ramin moved for a mistrial on the ground that Laleh's trial testimony disavowing her pretrial disclosures revealed that she had breached her statutory duties of disclosure under the Family Code. The court denied the motion. It stated that Laleh's testimony that some of her disclosures were not accurate "certainly affects her credibility" but declined to order a mistrial because Ramin had not demonstrated he had been "prevented from fully participating in [the] litigation."

At the conclusion of trial, the trial court issued a 41-page statement of decision addressing numerous issues.

Some of its findings we have already mentioned. As further relevant here, the court found that Laleh's testimony concerning financial matters was "mostly credible," including her testimony that she was not financially sophisticated, and that she credibly testified she was not sure or did not recall answers to many questions about financial matters. As noted, however, the court concluded she treated her financial disclosures "casually," although it "stop[ped] short of finding she perjured herself during either the disclosures of during her testimony." It found that her "casual attitude toward accuracy during the pendency of the litigation has led to unnecessary litigation and unnecessary discovery/investigation by [Ramin]."

The court found Ramin's testimony about the alleged "theft" of his inheritance to be "speculative in many areas" and "[h]is suspicions" concerning that subject to "fall far short of being convincing." It made no credibility determination concerning Ramin's testimony about the HELOC funds.

The court declined to shift the burden of proof to Laleh under *Margulis* to prove what happened to the HELOC funds or Ramin's inheritance. It articulated several reasons. It reasoned that *Margulis* burden-shifting did

10

not apply because: (1) "any moneys derived from [Ramin's] inheritance were *invested in Iran*, for lack of a better phrase, during marriage, not post-separation"; (2) *Margulis* does not apply to Ramin's separate property inheritance because it is not community property; (3) Laleh "played a minor role in the management of any monies in Iran, not an exclusive role [like the husband] in the *Margulis* decision"; and (4) the HELOC loan had been forgiven by the lender and written off as stated under oath in the couple's tax returns and "has not been under [Laleh's] management and control." Accordingly, it declined to order Laleh to reimburse Ramin for the missing assets.

The court also rejected Ramin's claim that Laleh breached her fiduciary duty through a conspiracy with her brother to steal Ramin's inheritance, on the ground there was no "complex plan" to do so.[6]

Finally, the court sanctioned Laleh under Family Code section 271 in the amount of $15,000 for having "significantly increased the cost of litigation in the matter by the casual nature of her approach to disclosures," which it found "resulted in unnecessary deposition questions, discovery investigations, mistrial motions and time spent questioning witnesses in trial." It sanctioned Ramin in the amount of $5,000 for having frustrated settlement and increased the cost of litigation in connection with the sale of the marital home and through voluminous pretrial requests for orders and ex parte applications.

The court entered judgment, and this timely appeal followed.

---

[6] The court rejected several additional breach of fiduciary duty claims the parties asserted against each other, none relevant to this appeal.

11

## DISCUSSION

Ramin's appellate briefing is somewhat unfocused. Although it contains a lengthy discussion of Laleh's pretrial disclosures, his motion for a mistrial and the court's denial of the mistrial motion, his only claim of error on appeal is that "the trial court prejudicially erred by refusing to order that the burden of proof be shifted to Laleh to account for [the HELOC proceeds and his inheritance]." This argument is supported by several subsidiary heading points, including "the *Margulis* burden-shifting procedure should have been ordered in lieu of granting a mistrial" and several points about the state of the evidence bearing on Laleh's control of the Iranian investments, culminating in an argument that he made a prima facie showing sufficient under *Margulis* as to the missing assets. He also asserts that the court's findings concerning her lack of control over the Iranian investments are not supported by substantial evidence.

We thus understand Ramin to argue solely that there was error under *Margulis*. He does not argue that Laleh's breach of her statutory disclosure obligations warrants reversal. Nor does he contend that the court erred in denying his motion for a mistrial.

## I.

### *Ramin Made a Prima Facie Showing Under* Margulis.

#### A.  Management and Control

We begin with the threshold requirement for burden-shifting under *Margulis*, which is proof of one spouse's management and control of marital assets. As noted, the trial court made a finding that Laleh did not manage and control the Iranian assets. Ramin argues that the finding is unsupported by substantial evidence and the evidence shows she did control them and had full access to information about them. We agree.

12

Although Ramin does not articulate the point this way, the thrust of his argument is that *as between the two spouses*, the uncontroverted evidence shows that Laleh had sole control of the couple's assets once they were sent to her brother in Iran and sole access to information about those assets. Laleh cites no contrary evidence. Specifically, she cites no evidence that *Ramin* had meaningful access to her brother or even any communications with her brother about the control or disposition of those assets, nor that Ramin had any meaningful access to records for the Iranian accounts or investments apart from information obtained from her brother. The evidence, as described by the parties, portrays a relationship between Laleh's brother, who acted as the couple's Iranian money manager, and Laleh alone, with Ramin relying on second-hand information from Laleh to keep him apprised of how their money was being invested.

This was sufficient to shift the burden under *Margulis*. Although *Margulis* did not involve a third-party money manager, its rationale rests on the fiduciary and statutory duties between spouses, which are equally applicable here (see *Margulis*, *supra*, 198 Cal.App.4th at pp. 1269-1272), and whether one spouse has "vastly unequal" access to the relevant records and information *relative to the other spouse* (*id*. at p. 1268, italics omitted), which the record overwhelmingly demonstrates was true here. *Margulis* concluded that requiring burden shifting in these circumstances "furthers the statutory purpose of requiring complete transparency and accountability in the management of community assets and of providing a remedy to the nonmanaging spouse when a breach of that fiduciary duty occurs." (*Id*. at p. 1274.)

That rationale applies here. Indeed, the undisputed evidence of the extreme lengths to which Ramin went after separation to *try* to obtain

13

information about the missing assets puts him in the same position as the wife in *Margulis* who could not determine or prove what happened to the couple's brokerage accounts. And like the husband in *Margulis*, Laleh had complete, unfettered access to the relevant proof; the only reasonable inference from the record is that had she bothered to *ask* her brother to tell her what happened to the money and provide her with documentary proof, he would have complied.[7] She testified she trusted him "110 percent," and he would do anything she asked of him.

Laleh argues that extending *Margulis* to the circumstances here, where her brother handled all the finances in Iran, is "bad policy" but does not explain why. And we agree with *Ramin* that it is not. If a spouse hires a professional money manager to invest community assets and, as between spouses, is solely responsible for managing that relationship, then nothing in *Margulis* would relieve that spouse from a duty to account to the other spouse for the assets placed under third-party control. The involvement of a third-party investment manager in no way diminishes fiduciary duties *between spouses*. Indeed, by managing the third-party *relationship*, the spouse *is* managing the community's assets placed under third-party control.

Accordingly, the trial court erred in finding that Laleh did not manage and control the couple's Iranian investments for purposes of the *Margulis* burden-shifting analysis.

### B. Value and Existence of Missing Assets

This brings us to Ramin's argument that he made a prima facie showing concerning the existence of assets in Iran in Laleh's possession and

---

[7] She testified she never asked her brother for the relevant banking records.

control at the time the parties separated, which was sufficient to shift the burden of proof to Laleh under *Margulis*.

We agree with Ramin that we review the question whether a prima facie showing has been made de novo, a point Laleh does not contest. This was implicit in *Margulis*, which held that the wife's introduction of a single document prepared by husband three years after separation listing the couple's assets satisfied her initial burden to show her husband controlled community assets of a certain value post-separation. (See *Margulis*, *supra*, 198 Cal.App.4th at pp. 1258, 1262, 1273.) The de novo standard on appeal applies to assessing whether the prima facie standard has been met. That question is a legal one: whether the evidence is sufficient to support a ruling in the plaintiff's favor if no controverting evidence is presented. (*ZL Technologies, Inc. v. Does 1-7* (2017) 13 Cal.App.5th 603, 612 (*ZL Technologies*).)

### 1. *The HELOC Proceeds*

The HELOC proceeds were sent to Iran in 2008, five years before the parties separated in 2013. In evaluating whether Ramin made a prima facie showing concerning their existence and value *at the time of separation*, we note that Lalah, to her attorney's credit, acknowledges that "the threshold for a prima facie showing is low." (See *ZL Technologies*, *supra*, 13 Cal.App.5th at p. 612 ["[S]light" evidence creating reasonable inference of fact sought to be proved suffices, and the evidence need not eliminate all contrary inferences]).

Ramin contends he met this low standard based on several pieces of evidence, viewed collectively. One is his testimony at trial that Laleh told him Ali bought real estate in Iran for them from the funds the couple had deposited into their joint Iranian bank account including the HELOC proceeds. He also asserts that, consistent with his testimony, Laleh's early

15

pretrial disclosures and written discovery responses admitted he and Laleh had existing real estate holdings in Iran, citing the December 2014 documents we have discussed (Trial Exhibits GGG and ZZ). The parties' ownership of real estate assets in Iran was further corroborated by the testimony of Laleh's friend, he asserts, who testified about the purchase of real estate in Iran.

Laleh does not address any of this evidence or argument. Her only response is that "the court had serious concerns about [Ramin's] credibility on these topics" and so "it can reasonably be concluded that [he] failed to meet this [prima facie] threshold." Credibility is not the issue; the question is whether the cited evidence would be sufficient to sustain a finding in Ramin's favor. It was. It was more than sufficient to sustain a finding that post-separation Laleh, through her brother in Iran, controlled real estate assets in Iran purchased during the marriage with the HELOC funds. Under *Margulis*, this evidence shifted the burden to Laleh to account for the missing assets or else charge her with their value. (See *Margulis*, *supra*, 198 Cal.App.4th at p. 1273.) She should have been required either to rebut Ramin's showing "or prove the proper disposition or lesser value of these assets." (*Id*. at p. 1267.)

Although neither party directly addresses the question of prejudice, their discussion of the evidence persuades us the error was not harmless. Laleh admitted she and Ramin transferred at least $130,000 of community assets from the HELOC to her brother in Iran and repeatedly just asserted the money was gone (" 'Do not ask about the money. There's no more money in Iran' ") or that she did not know what happened to it. Ramin has not asked us to direct entry in his favor on this issue outright and so we will not consider that question. He asks only for a retrial, and we will grant it. As in

16

*Margulis*, the court's error in failing to shift the burden of proof to Laleh requires a retrial of the community property issue (see *Margulis*, *supra*, 198 Cal.App.4th at p. 1280), which here entails the question whether to charge Laleh with the value of the funds withdrawn from the parties' HELOC.

### 2. *The Inheritance Proceeds*

Ramin relies on the same evidence just discussed to contend he made a prima facie showing concerning the post-separation existence of assets deriving from the proceeds of his inheritance. For the reasons just discussed, we agree from an evidentiary standpoint that he did so: he testified that the couple's Iranian real estate holdings, whose existence Laleh acknowledged in two pretrial disclosures (Trial Exhibits FFF and GGG), were funded partly with his inheritance.

But unlike the HELOC money, the parties acknowledge that his inheritance is separate property.[8] *Margulis* involves a spouse's fiduciary duty over the management and control over *community* assets. There is thus a legal question whether the *Margulis* burden-shifting framework applies to separate property one spouse manages and controls post-separation.

We are aware of no caselaw addressing that question. Nevertheless, we have no hesitation concluding that it does.

The general rule is that "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting," but the rule is qualified by the limitation that it applies "[e]xcept as otherwise provided by law." (Evid. Code, § 500.) " 'The

---

[8] Neither party has argued that any commingling of those separate funds with community HELOC funds has an impact under *Margulis* and therefore we do not address that question.

17

exception is included in recognition of the fact that the burden of proof is sometimes allocated in a manner that is at variance with the general rule.' " (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 660 (*Lakin*).) At bottom, allocation of burden of proof " 'is merely a question of policy and fairness' " in any given situation. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 120, italics omitted.)

" 'In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact.' " (*Lakin, supra*, 6 Cal.4th at pp. 660-661.)

Application of these factors in *Margulis* yielded the burden-shifting framework we have discussed. (See *Margulis*, *supra*, 198 Cal.App.4th at p. 1268.) Emphasizing that " 'bedrock concerns' of 'policy and fairness' drive the analysis," it explained that "a common trigger for burden-shifting is 'when the parties have unequal access to evidence necessary to prove a disputed issue.' " (*Ibid*.) It observed that "in marriages and separations . . . where one spouse exercised exclusive control over community property, the parties will have vastly *unequal* access to evidence concerning the disposition of that property" and concluded that in these circumstances, "fairness requires shifting to the managing spouse the burden of proof on missing assets." (*Ibid*.) *Margulis* concluded that statutory fiduciary duties of disclosure and accounting "further justify" shifting the burden of proof in this situation. (*Ibid*.)

The general burden-shifting principles that *Margulies* applied are not limited to community property issues. Appellate courts have shifted the

18

burden of proof in other family law contexts as well. (See *In re Marriage of D.H. and B.G.* (2023) 87 Cal.App.5th 586 (*D.H. and B.G.*) [motion to terminate child support]; *In re Marriage of Hein* (2020) 52 Cal.App.5th 519, 535-546 [accuracy of self-employed parent's corporate tax returns in connection with motion to modify child support].)

*D.H. and B.G.*, *supra*, 87 Cal.App.5th 586 is illustrative. In that case, a father was paying child support for a teenage daughter who lived with her mother. (See *id*. at pp. 590-591.) Under California law, child support continues for a child who has turned 18 while they are a "full-time" high school student, not self-supporting, unmarried and have not turned 19 or finished 12th grade. (See Fam. Code, § 3901, subd. (a)(1).) After his daughter turned 18, the father filed a motion seeking a judicial determination that his child support obligation had ended because his daughter had turned 18 and was no longer attending high school full-time and requesting reimbursement for payments he made when she was not attending school full-time. (*D.H. and B.G.*, at p. 590.) The trial court granted the father's motion, but the appellate court vacated the order because the trial court had misinterpreted the legal standard (i.e., the meaning of "full-time") and remanded for a further hearing. (See *id*. at pp. 592-593, 599-600.)

As relevant here, the appellate court rejected the mother's argument that the trial court had improperly shifted the burden of proof to her. (*D.H. and B.G.*, *supra*, 87 Cal.App.5th at p. 603.) Turning to "generally applicable burden of proof principles to determine who bears the burden in this context" (*id*. at p. 604), the court concluded that three of the four factors weighed in favor of shifting the burden to the mother. (See *id*. at pp. 605-606.) First, the mother had superior knowledge of the child's enrollment status and school attendance because she had primary custody; second, for the same reason,

19

the mother also had greater access to information and evidence concerning the daughter's school attendance (indeed, the father had tried to obtain school records for the daughter but was "only partly successful" because the mother had encouraged her daughter to " 'sign objections' " to his subpoenas); and third, public policy favored shifting the burden to the mother because of statutory duties imposed upon a custodial parent that "reflect a policy prioritizing the custodial parent's involvement in the child's education." (*Id.* at p. 606.) The court thus held that on remand, the mother should bear the burden of proof to show the daughter was attending school full-time. (*Ibid.*)

These considerations yield the same result in this case. Regarding the first two factors (knowledge and access to evidence), there can be no serious dispute that when one spouse has exclusive control over the management of separate property (especially where, as here, the property is overseas and the managing spouse has entrusted it to her family member there), "the parties will have vastly *unequal* access to evidence concerning the disposition of that property" and thus "fairness requires shifting to the managing spouse the burden of proof on missing assets." (*Margulis, supra,* 198 Cal.App.4th at p. 1268.)

And, as we have explained, it makes no difference that the most relevant information and records may be within the knowledge and possession of a third party who directly managed the separate property investment at Laleh's direction. Like the ex-wife in *D.H. and B.H.*, who had superior knowledge of and access to evidence about the child's school attendance through her custody of the daughter, so here Laleh has superior knowledge *and* access to evidence about the facts from her brother in Iran, with whom she has a very close relationship. And like the ex-husband in *D.H. and B.H.,* Ramin tried but was only "partly successful" in obtaining

information about his Iranian investments because of his ex-wife's conduct. (*D.H. and B.G.*, *supra*, 87 Cal.App.5th at pp. 605-606). As noted, the file folder concerning their Iranian investments disappeared when she left the marital home, and she also obtained a sizable judgment against Ramin in Iran that has prevented him from returning to that country to investigate his separate property interests.

This brings us, finally, to public policy considerations, a factor that weighed in favor of burden shifting in both *Margulis* and *D.H. and B.H.* (see *Margulis*, *supra*, 198 Cal.App.4th at pp. 1269-1272; *D.H. and B.H.*, *supra*, 87 Cal.App.5th at pp. 605-606) and does here too.[9] Section 721, subdivision (b) of the Family Code, the statute that was the "starting point" for *Margulis'* analysis of inter-spousal duties (*Margulis*, at p. 1269), states in relevant part that "in transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other," that "[t]his confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other" and "is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code . . . ." (Fam. Code, § 721, subd. (b).)

The fiduciary duties imposed by Family Code section 721 apply to separate property. *In re Marriage of Walker* (2006) 138 Cal.App.4th 1408,

---

[9] Application of the fourth factor, i.e., the probability of the existence or nonexistence of the fact (*Lakin*, *supra*, 6 Cal.4th at pp. 660-661), cuts neither way, as was true in *D.H. and B.H.* (See *D.H. and B.H.*, *supra*, 87 Cal.App.5th at p. 606).

21

1419) rejected the assertion that a spouse cannot be subject to breach of fiduciary duty for mismanaging separate property as "contrary both to sound public policy and to the language of Family Code section 721, subdivision (b) which speaks of the confidential relationship between husband and wife imposing on them the duty of 'highest good faith and fair dealing" and "not taking unfair advantage of the other.' " (*Ibid*.) There is "no reason," *Walker* reasoned, "to distinguish between a spouse's duty to deal fairly and in good faith with separate property and her duty to deal fairly and in good faith with community property." (*Ibid*.) We agree.

Like the fiduciary obligation governing the management of community property, the fiduciary obligation imposed on individuals to deal fairly and in good faith when managing their spouse's *separate* property "provide[s] strong support for shifting the burden of proof to the managing spouse when determining the value and disposition of missing assets." (*Margulis*, *supra*, 198 Cal.App.4th at p. 1269.) In such a case, the trust reposed in the managing spouse if anything is even greater because of the lack of financial self-interest involved. Just as when community property assets have gone missing under one spouse's watch, shifting the burden of proof to a managing spouse to account for missing separate property that they have solely managed for their spouse's benefit "both discourages unfair dealing and empowers the nonmanaging spouse to remedy any breach of fiduciary duty" by the other spouse. (*Margulis*, at p. 1271.)

For these reasons, we conclude the trial court erred by not shifting the burden of proof to Laleh to prove the disposition and valuation of Ramen's inheritance proceeds as well, despite the fact it is his separate property.

We emphasize that such a showing need not involve a rigorous, detailed accounting. As explained in *Margulis*, the managing spouse must

simply show "by competent evidence" that she has managed the assets in a manner consistent with her fiduciary obligations under Family Code section 721.  (*Margulis, supra,* 198 Cal.App.4th at p. 1279.)  Imposing sanctions on the managing spouse for violations of her statutory disclosure obligations, while appropriate in some cases, does not go far enough to uphold the duty of strict transparency and fair dealing imposed by the Family Code.

## DISPOSITION

The judgment is reversed.  The matter is remanded for a retrial of the community property issues consistent with the views expressed in this opinion.  Appellant shall recover his costs.

_____

                                        STEWART, P.J.



We concur.



_____

RICHMAN, J.



_____

MAYFIELD, J.*



_____

*In re Marriage of Mohammadijoo and Dadashian* (A163185)

* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


24

Trial Court: Contra Costa County Superior Court

Trial Judge:    Hon. Brian F. Haynes

Counsel:

Avedikian Law, Steven G. Hasegawa, for Plaintiff and Respondent.

Law Office of Kimball J.P. Sargeant, Kimball J.P. Sargeant, for Defendant and Appellant.